**Dorothy E. DAVIS et al.**

v.

**COUNTY SCHOOL BOARD OF PRINCE EDWARD COUNTY et al.**

**Civ. A. No. 1333.**

United States District Court
E. D. Virginia, Richmond Division.

Jan. 23, 1957.

Order Filed March 26, 1957.

Oliver W. Hill, Martin A. Martin, Spottswood W. Robinson, III, Richmond,

Va., Thurgood Marshall, Robert L. Carter, New York City, for plaintiffs.

Hunton, Williams, Gay, Moore & Powell, T. Justin Moore, Archibald G. Robertson, John W. Riely, T. Justin Moore, Jr., Richmond, Va., for County School Board of Prince Edward County, Virginia, and Thomas J. McIlwaine.

J. Lindsay Almond, Jr., Atty. Gen. of Virginia, Henry T. Wickham, Sp. Asst. to Atty. Gen., for Commonwealth of Virginia.

HUTCHESON, Chief Judge.

This case originated in the Richmond Division upon the filing of a complaint on May 21, 1951. The declared object of the complaint was, in substance, to obtain a declaratory judgment holding that segregation of pupils in the public schools in the county by races constituted discrimination in violation of the Fourteenth Amendment to the Constitution of the United States. There were also allegations concerning the inequality of school facilities, which last constituted a somewhat unimportant part of the controversy.

The case was heard February 25–29, 1952, by a three-judge court which had been convened in accordance with the provisions of the statute. The opinion of that Court was filed on March 7, 1952, and is reported in D.C., 103 F.Supp., 337. An appeal was allowed on May 5, 1952, and on May 17, 1954, the Supreme Court handed down its opinion, reversing the findings and conclusions of this Court, the case having been consolidated with four other cases then pending before it. See Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. At the suggestion of the Court the case was further argued as to specific questions hereafter more fully discussed, and the Court filed its second opinion on May 31, 1955. 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083. The mandate having been received by this Court on June 28, 1955, the case was called for further proceedings and on July 18, 1955, the three-judge court entered an order directing compliance with the terms of the mandate, but finding that it was not practicable to effect a change in the operation of the public schools of the county during the session beginning September 1955.

On April 23, 1956, plaintiffs filed a motion seeking an order fixing a time limit within which compliance with the order should be had, to which answer of the defendants was filed on June 29, 1956. On July 9, 1956, the three-judge court was reconvened and, pursuant to order previously entered, heard argument on the sole question of whether it should continue to function or if the case should be returned to the resident District Judge in whose division suit was instituted. On July 19, 1956, 142 F.Supp. 616, the Court announced its unanimous decision that since the constitutional question involved had been determined, the three-judge court should no longer function and the matter should be heard by the resident District Judge. On October 17, 1956, defendants filed a motion seeking the dismissal of the case upon the ground that the General Assembly of Virginia in extra session 1956 had provided the plaintiffs an adequate remedy at law in the courts of the Commonwealth.

The respective motions were argued on November 14, 1956, and the case is now before me as the resident District Judge for disposition of the motions upon the pleadings and certain exhibits which have been filed pertaining to the motions.

I am mindful that other District Courts have dealt with similar cases but in each case the Court was dealing with the record before it and with the problems of the particular locality affected by its order. Consequently, those decisions afford little, if any, aid in dealing with this case.

The questions raised by the supplemental answer and motion to dismiss the motion for further relief filed by the defendants on October 17, 1956, and the arguments thereon, may be stated as follows:

(a) Should the three-judge District Court be reconvened?

(b) Are certain statutes passed by the General Assembly of Virginia in extra session 1956 constitutional?; and

(c) Should plaintiffs be required to exhaust administrative remedies provided by the state statutes?

I shall first consider the questions presented in the last mentioned motion in the order stated.

■ From an examination of the applicable statute, Title 28, Section 2281, United States Code, and upon consideration of its purpose I reach the conclusion that in the present state of the record in this case it is not appropriate to request the convening of a three-judge court. There is no application before me for an order to restrain or enjoin the action of any officer of the state in the enforcement or execution of any state statute or order such as contemplated by the Act of Congress.

In the present state of the record of this particular case I do not consider the constitutionality of the state statutes referred to or the relief there provided proper subject of inquiry. They were the subject of argument at the hearing on November 14, 1956, and I shall dispose of the questions so raised without extended discussion.

The situation before me was aptly summed up by Judge Parker in Carson v. Warlick, 4 Cir., 238 F.2d 724, 728, in which he used the following language:

"It is argued that the Pupil Enrollment Act is unconstitutional; but we cannot hold that that statute is unconstitutional upon its face and the question as to whether it has been unconstitutionally applied is not before us, as the administrative remedy which it provides has not been invoked."

And further:

"It is to be presumed that these [the officials of the schools and the school boards] will obey the law, observe the standards prescribed by the legislature, and avoid the discrimination on account of race which the Constitution forbids. Not until

they have been applied to and have failed to give relief should the courts be asked to interfere in school administration. As said by the Supreme Court in Brown v. Board of Education, 349 U.S. 294, 299, 75 S. Ct. 753, 756, 99 L.Ed. 1083:

" 'School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles.' "

The opinion in School Board of the City of Charlottesville, Va. v. Allen (County School Board of Arlington County, Va. v. Thompson), 4 Cir., 240 F.2d 59, 64, contains language pertinent here. The Court again speaking through Chief Judge Parker, in referring to administrative remedies provided under Section 22–57 of the Code of Virginia, and after pointing out that the pupil placement law recently enacted by the General Assembly of Virginia had not become effective when the cases were heard (although it was effective at the time that opinion was rendered, as is the situation here) said:

" * * * Reliance is placed upon our decision in Carson v. Warlick, 4 Cir., 238 F.2d 724. In that case, however, an adequate administrative remedy had been prescribed by statute, the plaintiffs there had failed to pursue the remedy as outlined in the decision of the Supreme Court of the State and *there was nothing upon which a court could say that if they had followed such remedy their rights under the Constitution would have been denied them.*" (Emphasis supplied.)

See also Hood v. Board of Trustees, etc., 4 Cir., 232 F.2d 626, and Robinson v. Board of Education, etc., D.C.Md., 143 F. Supp. 481.

The quoted language appears in point in so far as the constitutional question is concerned. While the statutes involved

are not identical, the principle announced is applicable.

 Turning to the proposal that the plaintiffs be required to exhaust the administrative remedies provided by the state statutes, I am again confronted by the record before me. Being of opinion I am not in a position to pass upon the constitutionality of the statutes setting up the administrative remedy, it is my thought that I should not undertake to require the plaintiffs to seek any particular remedy. They are free to do so and thereby test the constitutionality of the statutes should they desire. However, that is a right, not an obligation. In the meantime, this is a matter of school administration in which I should not interfere.

It follows that the motion of the defendants to dismiss the motion for further relief should not be granted at this time. However, I incline to the view that instead of being dismissed it should be retained on the docket of the Court for final disposition at a later time should further proceedings develop an issue properly determinable in this case.

In undertaking to approach a solution to the troublesome problems involved in this case which are presented by the record and properly before me for determination, including the motion for further relief filed by the plaintiffs, it is to be borne in mind that the Supreme Court has decided only one legal principle which is concisely stated in the syllabus appearing in 347 U.S. 483, 74 S.Ct. 686, as follows:

"Segregation of white and Negro children in the public schools of a State solely on the basis of race, pursuant to state laws permitting or requiring such segregation, denies to Negro children the equal protection of the laws guaranteed by the Fourteenth Amendment * * *."

A study of the opinions of May 17, 1954, and May 31, 1955, reveals no other principle of law to serve as precedent or landmark in undertaking to apply the law to the facts, although certain well-recognized equitable principles are mentioned. For a clearer understanding of the question here presented, some discussion of those opinions at this point may be helpful.

In the 1954 opinion, which will be referred to as the First Brown case, 347 U.S. at page 495, 74 S.Ct. at page 692, the Court, after stating that "because of the wide applicability of this decision, and because of the great variety of local conditions, the formulation of decrees in these cases presents problems of considerable complexity", requested counsel to present further argument on questions which may be briefly summarized as follows: Whether a decree would necessarily follow providing that Negro children should forthwith be admitted to schools of their choice, or whether the Court should permit an effective gradual adjustment to be brought about to a system not based on color distinctions; whether the Supreme Court should formulate detailed decrees in the cases; if so, what specific issues should be reached thereby; if the appointment of a special master to hear evidence with a view of recommending specific terms for the decrees would be desirable; and finally, whether that Court should remand the cases to the courts of first instance with directions to frame decrees, and if that policy were followed, what general directions should the decree of the Supreme Court include and what procedures should the courts of first instance follow in arriving at the specific terms of more detailed decrees. For full text of the questions propounded and argued see 345 U.S. 972, 73 S.Ct. 1114, 97 L.Ed. 1388.

Following elaborate argument upon these questions, in which the Attorneys General of the affected states and the Solicitor General of the United States presented their views, the Court filed its opinion on May 31, 1955, which will be referred to as the Second Brown case. With knowledge of what was considered by the Court, as revealed by the questions, the language of the opinion in the Second Brown case takes on added sig-

nificance, both with respect to what was not said as well as to what was said. Certain portions of that opinion follow:

"Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles. Because of their proximity to local conditions and the possible need for further hearings, the courts which originally heard these cases can best perform this judicial appraisal. Accordingly, we believe it appropriate to remand the cases to those courts." [349 U.S. 294, 75 S.Ct. 756.]

The Court then proceeded to announce the following principles which should receive attention of the District Courts:

"In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power. At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis. To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield sim-

ply because of disagreement with them."

From the foregoing it is clear that the law must be enforced but the Court is acutely conscious of the variety of problems of a local nature constituting factors to be considered in the enforcement. Further emphasis upon this point is found on 349 U.S. at page 298, 75 S.Ct. at page 755, where the Court said:

"Because these cases arose under different local conditions and their disposition will involve a variety of local problems, we requested further argument on the question of relief."

Bearing in mind that the only legal issue in this case pertains to a right guaranteed by the Constitution, this language coupled with the action of the Court, takes on significance which can hardly be over emphasized. It is elementary law that one deprived of a right guaranteed by the Constitution ordinarily is afforded immediate relief. Notwithstanding this fundamental principle, the Supreme Court in this case has seen fit to specifically declare that while the plaintiffs are entitled to the exercise of a constitutional right, in view of the grave and perplexing problems involved, the exercise of that right must be deferred. With that declaration the Court used equally forceful language indicating that it realizes that conditions vary in different localities. Consequently, instead of simply declaring the right and entering a mandate accordingly, it has seen fit in the exercise of its equity powers to not only defer until a later date the time when the right may be exercised, but to clearly indicate that the time of exercising such right may vary with conditions. A realization of the effect of this action on the part of the Court is of supreme importance to an understanding of the course to be pursued by the Courts of first instance. At the risk of being repetitious, I again recall that: Before laying down these principles, the Court considered and rejected the suggestion that Negro children should be forthwith admitted to schools of their choice; reject-

ed the suggestion that it formulate detailed decrees; rejected the suggestion that a special master be appointed by it to hear evidence with a view to recommending specific terms for such decrees and adopted the proposal that the Court in the exercise of equity powers direct an effective gradual adjustment under the order of the Courts of first instance. Further, the Court considered and rejected the suggestion that a specified rule of procedure be established for the District Courts but placed upon those Courts the responsibility of considering, weighing and being guided by conditions found to prevail in each of the several communities to be affected by their decrees.

■ In the absence of precedent, in undertaking to follow the mandate of the Supreme Court, the District Courts are confronted with the necessity of following an uncharted course in applying the sole legal principle announced in the First Brown case. One idea which emerges clearly is that procedural rules adopted in one locality may be altogether inapplicable to conditions in another.

Boiled down to its essence, in the Second Brown case the Court after pointing out that the local school authorities have the primary responsibility of finding a solution to the varied local problems, proceeded to observe that the District Courts are to consider whether the actions of the local authorities are in good faith; and that by reason of their proximity to local conditions those Courts can best appraise the conduct of the local authorities. It is then pointed out that in so appraising, the Courts should be guided by the traditionally flexible principles of equity for adjusting and reconciling public and private needs. To be considered is the personal interest of the plaintiffs, as well as the public interest in the elimination of obstacles in a systematic and effective manner. During this period the Courts should retain jurisdiction of the cases. The Court has here clearly and in unmistakable terms placed upon the District Judges the responsibility of weighing the

various factors which prevail in the respective localities affected. There is here a recognition of the obvious fact that in one locality in which conditions permit, a change may be effected almost immediately. In other localities a specified period appropriate in each case may be feasible and a definite time limit fixed accordingly. In yet other communities a greater time for compliance may be found necessary. It is clear that the Court anticipated the application of a test of expediency in such cases so that an orderly change may be accomplished without causing a sudden disruption of the way of life of the multitude of people affected.

While the Supreme Court made no reference to yet another interest, there is one of a semi-public nature. This involves the teachers of the county, both white and colored, and their families, dependent upon them for support.

The conflicting rights and interests of racial and national groups in this country is nothing new. It is not confined to the Negro race but numerous illustrations might be used. A striking illustration is found in the situation of persons of Oriental origin who have come to this country. It is worthy of passing note to recall that the opinion appearing in the official reports immediately preceding the First Brown case involves the rights of persons of Mexican descent. Hernandez v. State of Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866. It must be borne in mind that these conflicts and the cases arising therefrom are the result of customs, traditions, manners and emotions which have existed for generations. In this particular case the customs to be changed have been not only generally accepted but repeatedly and expressly declared the law of the land since 1896.[1] While lawyers may have been conscious of the evolution of the law during this period and prepared to anticipate the possibility of a change, the average layman affected may not be charged with such prescience. Patience, time and a sympa-

1. Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256; Gong Lum v. Rice, 275 U.S. 78, 48 S.Ct. 91, 72 L.Ed. 172.

thetic approach are imperative to accomplish a change of conditions in an orderly and peaceful manner and with a minimum of friction.

█ In seeking a solution it is necessary to know and to understand the background upon which the factual situation is cast. In this connection it is necessary to examine briefly the present conditions in Prince Edward County, Virginia, historically and as revealed by the record in this case.[2]

Prince Edward County being inland from the easily navigable tidal reaches of the streams watering that region, was not settled until the first half of the 18th century, after the power of the Indians had been broken. At that time the pattern of life in the Colony had become established and the early residents carried with them the manners and customs prevailing in the more populous regions of Virginia. By 1783 the population consisted of 1,552 white and 1,468 colored residents. The 1950 census showed a population of 15,398, with the white and colored races approximately equal in number. During the intervening years the relations between the races have been harmonious, with a minimum of friction and tension as compared with some regions. During several decades prior to the War Between the States the processes of orderly and gradual adjustment which were becoming increasingly evident were interrupted by being involved in the political issues confronting the growing nation, with particular reference to regional differences and the clash of economic rivalries of various sections. Unfortunately this resulted in accentuating racial tension and hostility which became somewhat acute at times. While these conditions were common to the southeastern and southern parts of the country, it was felt less in Prince Edward and the surrounding area than in many other sections.

In the days following 1861–65 the entire section was poverty stricken. For the rank and file of both races there was a struggle for existence and education was of secondary importance. It is true that in this situation with the local government controlled by members of the white race and with severely limited means, there was inequality in the division, but members of the Negro race were not excluded from sharing, although to a lesser extent. This was due in part to an understandable, if erroneous, feeling that those upon whom the greater tax burden fell should receive the greater benefit. During the second quarter of the present century the economy of the section most seriously concerned has shown a marked improvement. Due to that improvement, corresponding advantages have resulted in housing, education and knowledge on the part of both races. Marked improvement in racial relationship resulted although many firmly fixed ancient customs and manners remain. With an improvement in the economic condition of the county and the resulting increase in available financial resources, an awareness of public sentiment, the mandatory requirements of the Virginia constitution and statutes upon the subject, coupled with suits brought in Federal Courts in other localities, the responsible authorities of Prince Edward County made plans for the erection of new school buildings exclusively for Negroes, which are now concededly equal if not superior to those occupied by the white pupils.

Before these plans could be completed, this suit was filed. Since the decision in the Brown case these plans have been completed. The defendants, who are the Superintendent and members of the School Board, and as such charged with the "primary responsibility for elucidating, assessing and solving" their problems, have proceeded with the operation of the schools in the county in accordance with the practice which has prevailed. They have prepared and submitted to the Board of Supervisors of the county annual budgets for the operation of the schools. In this connection it is to be borne in mind that the defendants have

2. See "History of Prince Edward County, Virginia"—Herbert Clarence Bradshaw—1955.

no authority under the law to levy or assess taxes nor to raise funds except in a limited manner by borrowing under certain conditions not pertinent here. Responsibility for providing local funds for the operation of schools rests upon the Board of Supervisors who are not defendants before this Court. The School Board consists of members appointed by the school trustee electoral board, the members of which in turn are appointed by the local state court. The members of the Board of Supervisors are elected by the people. Buttressed by popular demand of the people of the county since the decision in the First Brown case, evidenced in part by a petition signed by more than 4,000 residents, the Board of Supervisors has declined to allocate funds for the operation of schools on an annual basis. Instead it appropriates the necessary operating expenses on a monthly basis, with a publicly declared intention of discontinuing such appropriation if schools in the county are mixed racially at this time. In this connection attention is invited to the statutes recently enacted by the Virginia General Assembly under which the funds provided by the state may be withheld. Pending final interpretation of those statutes time valuable in the educational opportunities of the children involved might be irretrievably lost. Affidavits filed in this case and in no way controverted or mentioned by counsel for the plaintiffs, declare racial relations in the county to be more strained than at any time during the present generation.

In this state of facts I am called upon to fix a time when the defendants should be required to comply with the terms of the injunction issued by the three-judge court in obedience to the mandate of the Supreme Court. To do this I am to "adjust and reconcile public and private needs", by weighing and considering the personal interests of the plaintiffs as well as the interest of the public, in the elimination of obstacles in order that there may be a systematic, orderly and effective transition of the school system in accordance with the constitutional principles announced in the Brown case.

I believe the problems to be capable of solution but they will require patience, time and a sympathetic understanding. They cannot be solved by zealous advocates, by an emotional approach, nor by those with selfish interests to advance. The law has been announced by the Supreme Court and must be observed but the solution must be discovered by those affected under the guidance of sensible leadership. These facts should be self evident to all responsible people.

The children of both races, constituting an entire generation of this county, are the persons to be affected by whatever action may be taken and it follows that theirs is the real interest at stake, although closely connected with that of their parents and guardians.

Should the public schools of the county be closed for any reason, approximately three thousand children, including those of an age at which they are peculiarly impressionable, will be released from attendance. An interrupted education of one year or even six months at that age places a serious handicap upon the child which the average one may not overcome. Among those of the older age group there are some for whom it will mean the end of an education. Should the schools be resumed after an interruption, those among the younger group will be retarded in acquiring an education as compared with their contemporaries in other communities. With the release from discipline brought about by compulsory attendance at school, problems concerning juvenile conduct will be intensified with resulting injury to both children and the community and a resulting increase of racial tension with members of each race blaming the other for the lack of schools. In this connection it is to be remembered that the police protection of rural communities is different from that afforded in more populous areas. The salaries paid teachers in the state are not such as to enable them to accumulate a fund sufficient to support

themselves and their families over a protracted period of unemployment. Loss of employment would be a serious consequence to many teachers of both races who are established in the community. Tentative and substantial plans have been made for continuation by private means of the education of white children of the county. There is no such provision for Negro children. These considerations all involve the public and private interests of the community as distinguished from the quandary of the members of the School Board.

The admonition of the Supreme Court that the personal interests of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis is a consideration of which I am mindful. In response to a question from the bench, counsel for the plaintiffs stated that so far as he knew none of the orginal plaintiffs are now attending the schools. However, additional named plaintiffs have intervened and it is to be recalled that this is a class action. Should the plaintiffs be deprived of education or suffer an interruption in their education they will be handicapped. Concededly, their opportunities in so far as physical equipment and curriculum are concerned, are equal if not superior to those available to children of the white race. It has been held by the Court that segregation of white and colored children in public schools has a detrimental psychological effect upon the colored children. That is primarily the basis upon which the Brown case is founded. It is my belief that at this time a continuation of present methods could not be so harmful as an interrupted education.

Laying aside for the moment the probability of the schools being closed, in the present state of unrest and racial tension in the county it would be unwise to attempt to force a change of the system until the entire situation can be considered and adjustments gradually brought about. This must be accomplished by the reasonable, clear-thinking people of both races in that locality. This objective cannot be achieved quickly. It does not require the opinion of a psychologist to understand that disaffection, uneasiness and uncertainty of the adult world around them creates emotional problems for children concerned. A sudden disruption of reasonably amicable racial relations which have been laboriously built up over a period of more than three and a quarter centuries would be deplorable. At any reasonable cost, it must be avoided.

I conceive the immediate problems of the Court to be to determine whether the School Board is acting in good faith and whether the facts before the Court at this time are such that an order fixing a time limit for compliance with the decree is proper, taking into consideration the various factors outlined in the Brown case to which consideration has been given. I do not conceive it to be within the power of this Court to forecast conditions which may exist in the future. Stated differently, I must reach a conclusion based upon the facts existing at this time in the locality to be affected.

The passage of time with apparent inaction on the part of the defendants of itself does not necessarily show non-compliance. This is illustrated by the fact that after the appeal in this case was granted in May, 1952, more than three years elapsed before the mandate of the Supreme Court was received. I find that the defendants by submitting the usual budget requesting appropriations have done all that reasonably could be required of them in this period of transition. Action which might cause mixing the schools at this time, resulting in closing them, would be highly and permanently injurious to children of both races. Relations between the members of the two races in the county would be adversely affected and a final solution of the vexing problems delayed as a consequence.

At this time the children of both races are being afforded opportunities for an education under an adequate system that has been formulated over the years. If an order should result in racially integrated schools, the school system of itself would change greatly. Plans should

be made to keep within bounds the automatic adjustments that would follow in order that society not be too drastically affected.

Many minds are now engaged in seeking an equitable solution of the problem, including those of the defendants. As was said by a great statesman, "The march of the human mind is slow".[3] It is inconceivable that any of the litigants or other persons affected would willingly see the public school system abolished or an interruption in the education of the children of the county. Either result would be disastrous to both public and private interests of the county.

It is imperative that additional time be allowed the defendants in this case, who find themselves in a position of helplessness unless the Court considers their situation from an equitable and reasonable viewpoint.

Considering all the factors, it is my conclusion that decision of the motion for further relief filed by the plaintiffs should be withheld at this time, with the reservation to the plaintiffs of the right to renew the motion at a later date after the defendants have been afforded a reasonable time to effect a solution.

In conclusion, attention is again called to the following language of the Supreme Court which is the law of this case and must be observed [349 U.S. 294, 75 S.Ct. 756]:

"But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them."

### ORDER

For reasons stated in the opinion filed herein on January 23, 1957; it is

ORDERED that (a) the Court does not pass on the matters raised in the defendant's motion to dismiss the motion for further relief (including any and all questions involving the constitutionality of the statutes of the Commonwealth of Virginia there mentioned);

(b) the motion that a three-judge court be convened to consider and pass on questions before the Court at this time is denied; and (c) the motion for further relief filed by the plaintiffs herein is denied at this time.

It is further ORDERED that this action be retained on the docket of this Court for such further proceedings as may be appropriate.

---

3. Edmund Burke—"Speech on the Conciliation of America".