**Eva ALLEN et al.**

v.

**COUNTY SCHOOL BOARD OF PRINCE EDWARD COUNTY, VA., etc., et al.**

Civ. A. No. 1333.

United States District Court
E. D. Virginia,
Richmond Division.

Aug. 4, 1958.

Oliver W. Hill, Spottswood W. Robinson, III, Richmond, Va., Robert L. Carter, New York City, for plaintiffs.

Albertis S. Harrison, Jr., Atty. Gen. of Virginia, Hunton, Williams, Gay Moore & Powell, Archibald G. Robertson, Richmond, Va., for defendants.

STERLING HUTCHESON, Chief Judge.

This case comes before me again pursuant to a mandate from the United States Court of Appeals, Fourth Circuit, by *per curiam* opinion which is reported in 249 F.2d 462. For a somewhat comprehensive history of the litigation, reference is made to my opinion reported in Davis v. County School Board, D.C., 149 F.Supp. 431. As will be seen from an examination of those opinions, when the case was last before me I heard evidence and reached the conclusion that in the exercise of discretion vested in the District Courts by the Supreme Court in the cases reported as Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, and 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (see also 345 U.S. 972, 73 S.Ct. 1114, 97 L.Ed. 1388), the interests of the litigants and of the public would not be best served by fixing a definite date upon which the defendants should comply with the order prohibiting segregation of children in the schools of Prince Edward County solely on account of race. An appeal was taken and in accordance with the opinion mentioned, the Court of Appeals reversed my decision and remanded the case to me with certain directions.

The case as now before the Court has the following issues presented for determination.

1. A motion to intervene filed by J. B. Minnick, argued on June 6, 1958, and renewed on July 21, 1958.

2. A controversy concerning taxable costs.

3. A motion filed by the plaintiffs, seeking the entry of an order directing the defendants to comply with the injunction heretofore entered at the beginning of the school term in September 1958, and a counter motion filed by the defendants for a general continuance pending a survey of the school problems in the County by an independent agency. These will be dealt with jointly.

These several matters will be considered in the order stated.

### The Petition to Intervene

The petitioner, J. B. Minnick, a practicing attorney of Arlington, Virginia, seeks to intervene in his own right as a citizen and in behalf of others similarly affected and to have this Court re-examine certain constitutional issues. He contends that when this case, along with others known as the School Segregation Cases, and reported as Brown v. Board of Education, supra, was decided, the Supreme Court overlooked certain basic legal principles, particularly the statutes pertaining to land grant col-

leges and the provisions of the several acts admitting new states to the Union, with provision concerning operation of the schools of the state. I find it unnecessary to discuss the merits of his contentions. Whether these matters were called to the attenion of the Supreme Court in these cases or were overlooked by that Court is beside the point. So far as this particular case the law has been settled and it is too late for a review to be had in this proceeding. It follows that the petition to intervene must be denied.

## Costs

The defendants question several items of costs which will be dealt with separately.

■ a. . The plaintiffs seek the recovery of the sum of $215, expended for photographs showing the condition of the respective school buildings, which were filed as exhibits at the original hearing. They also claim an item of $500 paid to Dr. Thomas H. Henderson, an expert witness called by the plaintiffs, who testified with respect to the inequality of the educational facilities, and the sum of $725 as expert witness fees for Mrs. Evelyn W. Shaed, a statistician employed in the office of counsel for the plaintiffs. It appears clearly that under the rule followed by the Fourth Circuit in an opinion by Judge Parker in Specialty Equipment and Machinery Corporation v. Zell Motor Car Company, 193 F. 2d 515, at page 520, and cases cited, these items of cost should not be allowed. See also Henkel v. Chicago, St. P., M. & O. R. Co., 284 U.S. 444, 52 S.Ct. 223, 76 L.Ed. 386, and National Labor Relations Board v. School-Timer Frocks, Inc., 4 Cir., 248 F.2d 831.

b. The item of $446.40, witness fees allowed by the Clerk, is approved.

c. The defendants have withdrawn their objection to an item of $148.75, representing one-half of the cost of copies of certain records. It follows that this should be allowed.

■■ d. Prior to the trial the defendants arranged with the court reporter to obtain daily transcripts of the proceedings. In accordance with the usual practice this was under a special arrangement with the reporter and he is permitted to make additional charges necessitated by the personnel required to furnish such service. Counsel for the plaintiffs with the approval of counsel for the defendant, arranged with the reporter to obtain a copy of the transcript, which, together with one-half of the per diem, amounted to $770.25. Plaintiffs contend that this item should be taxed as costs. While it is proper to tax as costs on appeal a copy of the transcript obtained by the prevailing party, this should be limited to the regular charges of the reporter for such transcript furnished in ordinary course and should not include the additional charge incident to the special service provided. It is therefore my conclusion that the plaintiffs should receive as a part of the taxable costs that portion of the item of $770.25 representing one copy of the transcript furnished in ordinary course.

## The Motion of the Plaintiffs and the Counter Motion of the Defendants

When the motion of the plaintiffs was filed on June 6, 1958, counsel for the defendants indicated their desire to be heard and July 14 was fixed as the time. At the hearing defendants offered affidavits, but upon suggestion of counsel for plaintiffs that they desired an opportunity to cross-examine the witnesses, the defendants called the following residents of Prince Edward County: James T. Clark, Sheriff of Prince Edward County since March 1944, and prior to that time from February 1936 Deputy Sheriff, the successor in that office of his father, who had been Sheriff since the present Sheriff was five years of age; D. C. Womack, Commissioner of the Revenue of the County since January 1940, and prior to that time engaged in the wholesale grocery business in the County; Lester E. Andrews, a member of the School Board for four years and chairman during the last three, who is a retail lumber dealer; and B. Calvin Bass,

now engaged in dairy farming at Rice, deputy chairman and former chairman of the School Board. Mr. Bass has had experience in teaching in the schools of the County and Hampden-Sydney College. He had teaching experience in Tennessee, including the position of School Principal and Assistant Superintendent. T. J. McIlwaine, who has been Superintendent of the schools for approximately forty years, was offered for cross-examination, with the statement that his testimony would be corroborative of that already heard. He was then called by the plaintiffs under Rule 41 and cross-examined.

These witnesses were unanimous in expressing the opinion that racial relations in the County have deteriorated to a marked degree since 1954. They believe that the effectiveness of the entire educational system in the County is suffering as a result of the atmosphere in which the schools are being operated. They express apprehension with respect to both violence and closing of the schools if the motion of the plaintiffs should be granted. The Sheriff pointed to the necessity of maintaining order in the County having an area of 354 square miles, bisected by highways over which school buses travel. It is his opinion that the local enforcement officers, reinforced by the entire state constabulary or highway patrol, would not be sufficient to maintain order if violence should erupt.

The conditions shown are to be deplored and those responsible may be the proper objects of censure if proper responsibility could be fixed. Considering the complexities of the entire problem this would present an impossible task, involving honest, sincere emotions felt by those on both sides of the controversy. However, we are faced with a situation rather than a theory and, being invested with a discretion in determining how this situation best may be met, it is necessary to seek a course to follow which appears in the best interest of all concerned at this time.

The defendants filed a copy of a recent resolution of the School Board authorizing the employment of expert professional assistance in conducting a survey and counselling the Board in connection with the entire school problem in the County. Superintendent McIlwaine has been charged with taking steps in this direction and testified that it is the next order of business with him. The plaintiffs offered no evidence.

At the conclusion of the testimony counsel for the defendants filed a motion that further action be deferred pending a survey, as referred to, and the consequent formulation of plans by the School Board. The matter was then ably argued by counsel, the plaintiffs insisting that an order be entered directing a start toward compliance with the decree beginning in September 1958, and the defendants urging additional time within which to effect a plan of operation.

█ In approaching the problem it is well to bear in mind that this is not a lawsuit nor is it a cause in equity in the conventional sense. In the first, the Court lays down legal principles to guide the parties. In a proceeding in equity the chancellor formulates the rules to be applied. In this case the District Judge must be guided by broad, flexible principles of equity while acting as arbiter of policies to be formulated and carried out by the local school authorities.

As pointed out by the Court of Appeals, compliance with the order may be brought about in ways other than by mixing schools.[1] However, this is a matter for determination by the local authorities subject to approval or disapproval of the Court. Supposing that the Court was apprised of a solution, it would not be within its province to direct its adoption since the Court has only the authority to approve or disapprove the acts of the defendants.

1. That Court pointed to voluntary continuation of the present system as one method of meeting the requirement. 249 F.2d 462, at page 465.

As set out in my opinion filed January 1957, the Supreme Court did not lay down rules to be followed by the District Courts in solving the problem, but left a wide latitude for the exercise of discretion. An examination of the opinion of the Court of Appeals decided November 11, 1957, supra, reversing my decision, reveals that that tribunal has been equally abstentious in charting a course. That Court refrained from pointing to what it regarded as the fallacies of my reasoning. Consequently, I do not have the benefit of its views as to the particulars of my errors nor have I been granted the assistance which might have been afforded had that Court seen fit to expound its interpretation of the language of the Supreme Court in the Brown cases with which I am seeking to comply. The only light thrown upon the subject by the Court of Appeals is found in the following language:

"and we think that the District Judge was in error in not fixing a time limit for compliance with the order theretofore entered in the cause." [249 F.2d 464.]

As authority for this conclusion the Court quoted from an opinion by the Chief Judge of the Fifth Circuit in Jackson v. Rawdon, 235 F.2d 93, 96, to the effect that the plaintiffs there were entitled to have the defendants " * * * acting promptly, and completely uninfluenced by private and public opinion as to the desirability of desegregation in the community, proceed with deliberate speed consistent with administration * * * ".

We turn to that opinion to ascertain what right the plaintiffs there were seeking to establish and find that it does not involve fixing a time limit to comply with an order. The plaintiffs there were seeking merely a declaration of their rights by the Court. The sentence in the opinion of the Chief Judge of the Fifth Circuit following the sentence partially quoted by the Fourth Circuit Court reads as follows:

"Had the court made such a declaration (of the constitutional rights of the plaintiffs) and retained the cause for further orders necessary to implement it, deferment to a later time of action on the prayer for injunctive relief, if necessary, may well have been within his discretion."

In my initial study of the Brown cases, I considered Jackson v. Rawdon, and was influenced, in part, by that opinion in reaching my conclusions stated in January 1957, supra. Finally, the opinion of the Fourth Circuit concludes with directions that this Court enter an order directing the defendants to "make a prompt and reasonable start toward complying with the Court's order enjoining discrimination on the ground of race or color in admitting children to the schools under their supervision."

So, as is seen, the Court of Appeals has said in broad and general terms that I was in error in not fixing a time limit for compliance, that I should say plainly the defendants must comply without further delay and a prompt and reasonable start must be made. It is to be observed that the Court refrained from indicating what would be a proper time to fix, what act of compliance must be without further delay, and they have failed to define a prompt and reasonable start. It is clear that the Court recognizes what the Supreme Court announced, namely, that the responsibility is upon the District Court to pass upon the details. Working out the details is not an assignment of a minor nature and if I am to use that discretion called for by the Supreme Court, recognized by the Court of Appeals and which should motivate a chancellor in applying equitable principles, the difficulties must be recognized.

In this state of affairs I feel that it is proper that I further discuss the problem and give my reasons for the conclusions to be stated. The Court of Appeals says correctly that the enforcement of a right may not be denied because of action taken or threatened in defiance of such right. But the Supreme Court has announced in an epochal opinion that the exercise of a right guaran-

teed by the Constitution of the United States may be deferred until necessary local adjustments in the public interest may be effected. It is clear that Court did not anticipate hurried, ill-considered action. Judging from the experience of other localities it may be observed that violence may be within the realm of probability if precipitate action is taken. While this consideration of itself is secondary the psychological effect of such conditions upon immature children is of primary importance. It must be ever borne in mind that the children are those for whom the entire educational system was devised and their interests are not to be lost sight of in the conflicts of the adult world in which they live.

So far as I have been able to ascertain, the nearest analogy afforded by decided cases is that of Rippy v. Borders, 250 F.2d 690, decided December 1957 by the Fifth Circuit. Stripped of legal and procedural niceties it appears that the District Court twice declined to order compliance with the decision in the Brown cases. Twice he was reversed. He then entered an order fixing the midwinter term in January 1958 as the time for compliance and again he was reversed. See Bell v. Rippy, D.C., 133 F. Supp. 811; Brown v. Rippy, 5 Cir., 233 F.2d 796; Bell v. Rippy, D.C., 146 F. Supp. 485; Borders v. Rippy, 5 Cir., 247 F.2d 268; Rippy v. Borders, 5 Cir., 250 F.2d 690, 693. For a concise statement of the history of this litigation see also 3 Race Rel.Law Rep., 17. It is quite true that the facts in that case may be distinguished from those in the instant case, but the Court of Appeals there made it clear that "the authority to administer the public schools is vested in the appellants, the Board and the Superintendent, and, of course, they are the ones required to make the necessary arrangements referred to in the judgment to be entered by the district court as directed by our mandate". After stating that should the local authorities fail to meet their primary responsibility, then the duty will devolve upon the District Court to hold a hearing and proceed so as to require compliance. The Court used the following language:

"In the performance of that duty, the district court must exercise *its own* judgment and discretion in accordance with the applicable principles of law set forth in Brown v. Board of Education of Topeka, supra." (Emphasis by the Court.)

In the argument before me it was urged that since the local authorities have not adopted a plan, an order directing immediate compliance should be entered upon the theory that the Court under those conditions would not be responsible for the consequences which might result. I am unable to agree that this would be a proper discharge of the responsibility placed upon the Court. In his dissenting opinion in the case of Sharp v. Lucky, 252 F.2d 910, at page 924, Circuit Judge Ben F. Cameron, of the Fifth Circuit, aptly stated the responsibility resting upon the District Judges. In referring to the period in the life of the Nation which has become well known as "The Tragic Era" from the title given his book by Claude G. Bowers[2] Judge Cameron said:

"This sad epoch in our history was fomented in no small part, by well-intentioned men in too much of a hurry. The basic lesson wise men have learned from its excesses and its tragedies is that civil rights can be insured and protected only by local government administered by men with a sympathetic understanding of the many facets of the problems involved; men who approach their task ·in a spirit of friendship and local obligation. Government can succeed only when its mandates deserve and command the respect and the consent of the governed. * * *

"If we, in whose hands responsibility for leadership and judgment

---

2. "The Tragic Era—The Revolution after Lincoln" 1929, The Riverside Press, Cambridge, Mass.

is placed, open our eyes to the teachings of history and perform our duties with patience, with sympathy and with common sense; we shall make a contribution toward averting a repetition of an epoch from which nobody derived any benefit and in which everybody suffered."

To this might be added the warning that if we make mistakes by impatience and failure to consider and to endeavor to understand, however good our intentions may be, we are responsible for the consequences because that responsibility has been placed upon us by the Supreme Court. For my part, I believe much harm can be caused by ill-considered action. The conditions which have arisen in other places constitute a warning which should not be ignored.

We hear such terms as "the jet age", "a new day" and "crash programs" used as excuses for speedy action. These catch phrases are not consistent with the "deliberate speed", the "unhurrying chase" and the "unperturbed pace" ascribed by Thompson to his Hound of Heaven. Furthermore, they are not applicable to the situation with which we are dealing.[3] In the case cited in the footnote the Supreme Court recognized the difference between action by an individual and action by a State. The distinction appears to be in point. Despite the great advances made in scientific and technical knowledge we have no evidence upon which to base a belief that in accepting new theories of social or moral reform the modern human mind is any more adaptable than that of the Athenian of 500 B. C. The knowledge of preceding generations can be preserved in writings but wisdom cannot be transmitted by inheritance. It must be acquired by experience.

In dealing with problems accompanying such reforms we must look to the teachings of history if we are to avoid treacherous shoals. History affords many lessons we would do well to heed.

We find that following the adoption of his code of laws, which he described, not as the best that could be given the people but, as "the best they could receive". Solon, in order to afford a period for its acceptance by the people and to avoid importunities for interpretation, modification, etc., absented himself for ten years during which he visited foreign countries. Upon his return there yet remained much to be done.[4]

Later we find the admonition of The Great Teacher that morality cannot be enforced by Pharisaic legalism. He pointed to the truth that the application of external force will not "cleanse * * * that which is within the cup and platter,"[5] the essential first step in reform.

Innumerable illustrations might be used. Among more modern ones, reference has already been made to the period in the history of our country known as "The Tragic Era", which has also been called "The Age of Hate".[6]

Within the memory of many of us, this Nation embarked upon a sudden and determined effort to enforce upon the people a code of morality adopted as an amendment to the Constitution of the United States. It was designed to reform the customs of the Nation in the use of intoxicating liquors and it was called "The Noble Experiment". To assist the Government in its enforcement.

3. As pointed out by Mr. Justice Holmes in Commonwealth of Virginia v. State of West Virginia, 1911, 222 U.S. 17, at pages 19-20, 32 S.Ct. 4, at page 6, 56 L.Ed. 71: "But a state cannot be expected to move with the celerity of a private business man; it is enough if it proceeds, in the language of the English Chancery, with all deliberate speed".

4. Plutarch relates that: "And, therefore, when he (Solon) was afterwards asked if he had left the Athenians the best laws that could be given, he replied, 'The best they could receive'." Plutarch's Lives— New York. McKinlay, Stone and MacKenzie—1924.

5. Matthew 23:25, 26.

6. "The Age of Hate; Andrew Johnson and the Radicals"—George Fort Milton. New York. Coward-McCann, Inc.— 1930.

a nationwide moral crusade was waged by private enterprise and religious organizations. The failure of the experiment is too well known to require discussion. That action was too precipitate. There had not been a sufficient preparatory cleansing of the inside "of the cup and of the platter". Contrary to the situation before us, there was no provision for flexibility of enforcement. The history of civilization is a story of trial and error. We have here a more reasonable rule to follow than that which prevailed under the 18th Amendment and the statutes enacted under that Amendment. Within the bounds of this rule latitude is allowed for meeting conditions in a practical manner in the search for the correct solution.

It should be pointed out that in none of the episodes referred to was the emotional appeal more deeply seated or based upon more honest convictions of right on both sides to the controversy than in the situation before us nor was the impact more far-reaching.

It has been demonstrated that the hearts and the minds of men cannot be controlled by legislation nor by force. It has been demonstrated that violence can be quelled by force, such as the use of troops, but unless proper preliminary preparation has been had, when the force is removed festering scars remain requiring treatment of the type administered by Judge Harry J. Lemley of the Eastern District of Arkansas in his recent opinion in Aaron v. Cooper, D.C., 163 F.Supp. 13, known as the Little Rock Case. It is realized that these observations may appear trite, but in periods of stress we often need to recall to mind and to be guided by simple truths, which we are prone to overlook at times.

It is belaboring the point to again call attention to the obvious fact that the Supreme Court recognized all this as disclosed by its language in the Brown cases. A reading of those opinions clearly reveals that the Court should not confuse delay with defiance of or non-compliance with the law. The law must be observed and the questions here to be determined relate only to the method and time of such observance. Over-hasty action necessitating a backward step is less conducive to proper law enforcement than action taken after carefully considered delay, even though the Court may be criticised for delay by those impatiently urging speedy action.

The defendants should proceed promptly with the formulation of a plan which will comply with the order heretofore entered enjoining them from discriminating against the plaintiffs in admission to the schools in the County solely on account of race. They have indicated their purpose to so proceed.

The proposal of the defendants that a comprehensive survey of the entire problem be made by experts trained in the subjects involved is, so far as I am informed, an approach which has not been tried elsewhere. Considering the weight and importance which have been given psychological and sociological factors, such an approach would appear to have merit and to contain the possibility of a worth-while recommendation dealing with the problems peculiar to the particular community with which we are concerned.

I do not conceive it to be within the province of the Court to specify what steps the defendants should take but deem it not inappropriate to make this comment concerning their proposal. As declared by the Supreme Court in the Brown cases and by the Fifth Circuit in Rippy v. Borders, the primary responsibility is theirs and the function of this Court is to either approve or disapprove their actions.

The Court of Appeals has directed that a date be fixed for compliance with the mandate.

In determining what would be a proper time to fix for compliance, a number of factors and some precedents have been considered. Obviously, it is not in the best interest of those concerned to comply with the suggestion of the plaintiffs that compliance be had with the beginning of the school year in Septem-

ber 1958. Such a course would be unrealistic. It is equally obvious that at this time there is no evidence before the Court upon which to base an opinion as to what would be a proper time. It is anticipated that progress reports to be made by the defendants in the future will throw light upon this phase of the problem. Turning again to precedent available in somewhat comparable situations, it is recalled that Solon considered ten years an appropriate interval to allow for adjustments to far-reaching changes in the customs of a people. The period of greatest turmoil following the death of President Lincoln, is regarded as about twelve years. The efforts to enforce the 18th Amendment were concentrated over a period of some twelve or fourteen years. Concededly, these yardsticks are of limited aid but they do reflect some past experiences with human behavior. No better measure has been suggested nor has one occurred to me. As I have pointed out previously, it is not possible for a Court to forecast conditions which will exist in the future. It can only find facts which exist at a stated time, past or present.[7] In full realization of this limitation but faced with directions from the Court of Appeals to fix a date and believing that some assurance of stability of conditions in the immediate future may be beneficial to the people of the County, in their efforts to meet the changed conditions, I fix ten years following the 1955 decision in the Brown cases as the time for such compliance. However, because of the uncertainty of conditions during the interval and the absence at this time of a sound basis for this conclusion, the power to change this date by either reducing or extending the time will be expressly reserved and action under such reservation will be in accord with what may develop in the future.

An order will be entered directing an immediate start in the necessary preliminary steps looking to the formulation of a plan, with directions that on or before January 1, 1959, the defendants inform the Court concerning progress to that date. The report should reflect the scope and purpose of the survey and general information regarding the qualifications of such consultant or consultants as have then been engaged. The order will direct compliance with the terms of the injunction heretofore entered at the beginning of the school year for 1965, unless such order should be modified during the interval. The order will expressly reserve to the Court the power to modify it by accelerating or extending the date of compliance and in such other respects as the best interest of the parties and of the public may appear proper including the power to direct additional reports from time to time as may be deemed appropriate.

7. 149 F.Supp. 431, at page 439.