# NATIONAL ASSOCIATION FOR THE ADVANCE-MENT OF COLORED PEOPLE *v.* BUTTON, ATTORNEY GENERAL OF VIRGINIA,

### ET AL.

No. 5.  Argued November 8, 1961.—Restored to the calendar for reargument April 2, 1962.—Reargued October 9, 1962.— Decided January 14, 1963.

*Robert L. Carter* reargued the cause for petitioner. With him on the briefs was *Frank D. Reeves*.

*Henry T. Wickham* reargued the cause for respondents. With him on the brief was *David J. Mays*.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

This case originated in companion suits by the National Association for the Advancement of Colored People, Inc. (NAACP), and the NAACP Legal Defense and Educational Fund, Inc. (Defense Fund), brought in 1957 in the United States District Court for the Eastern District of Virginia. The suits sought to restrain the enforcement of Chapters 31, 32, 33, 35 and 36 of the Virginia Acts of Assembly, 1956 Extra Session, on the ground that the

statutes, as applied to the activities of the plaintiffs, violated the Fourteenth Amendment. A three-judge court convened pursuant to 28 U. S. C. § 2281, after hearing evidence and making fact-findings, struck down Chapters 31, 32 and 35 but abstained from passing upon the validity of Chapters 33 and 36 pending an authoritative interpretation of these statutes by the Virginia courts.[1] The complainants thereupon petitioned in the Circuit Court of the City of Richmond to declare Chapters 33 and 36 inapplicable to their activities, or, if applicable, unconstitutional. The record in the Circuit Court was that made before the three-judge court supplemented by additional evidence. The Circuit Court held the chapters to be both applicable and constitutional. The holding was sustained by the Virginia Supreme Court of Appeals as to Chapter 33, but reversed as to Chapter 36, which was held unconstitutional under both state and federal law.[2] Thereupon the Defense Fund returned to the Federal District Court, where its case is presently pending, while the NAACP filed the instant petition. We granted certiorari. 365 U. S. 842.[3] We heard argument in the 1961 Term

---

[1] *NAACP* v. *Patty*, 159 F. Supp. 503 (D. C. E. D. Va. 1958). On direct appeal under 28 U. S. C. § 1253, from the judgment striking down Chapters 31, 32 and 35, this Court reversed, remanding with instructions to permit the complainants to seek an authoritative interpretation of the statutes in the Virginia courts. *Harrison* v. *NAACP*, 360 U. S. 167. In ensuing litigation, the Circuit Court of the City of Richmond held most of the provisions of the three chapters unconstitutional. *NAACP* v. *Harrison*, Chancery causes No. B–2879 and No. B–2880, Aug. 31, 1962.

[2] *NAACP* v. *Harrison*, 202 Va. 142, 116 S. E. 2d 55 (1960). Chapter 36, which is codified in § 18.1–394 *et seq.*, Code of Virginia (1960 Repl. Vol.), prohibits the advocacy of suits against the Commonwealth and the giving of any assistance, financial or otherwise, to such suits.

[3] Certiorari was first granted *sub nom. NAACP* v. *Gray.* The litigation began *sub nom. NAACP* v. *Patty, Attorney General of*

and ordered reargument this Term. 369 U. S. 833. Since no cross-petition was filed to review the Supreme Court of Appeals' disposition of Chapter 36, the only issue before us is the constitutionality of Chapter 33 as applied to the activities of the NAACP.

There is no substantial dispute as to the facts; the dispute centers about the constitutionality under the Fourteenth Amendment of Chapter 33, as construed and applied by the Virginia Supreme Court of Appeals to include NAACP's activities within the statute's ban against "the improper solicitation of any legal or professional business."

The NAACP was formed in 1909 and incorporated under New York law as a nonprofit membership corporation in 1911. It maintains its headquarters in New York and presently has some 1,000 active unincorporated branches throughout the Nation. The corporation is licensed to do business in Virginia, and has 89 branches there. The Virginia branches are organized into the Virginia State Conference of NAACP Branches (the Conference), an unincorporated association, which in 1957 had some 13,500 members. The activities of the Conference are financed jointly by the national organization and the local branches from contributions and membership dues. NAACP policy, binding upon local branches and conferences, is set by the annual national convention.

The basic aims and purposes of NAACP are to secure the elimination of all racial barriers which deprive Negro citizens of the privileges and burdens of equal citizenship rights in the United States. To this end the Association engages in extensive educational and lobbying activities. It also devotes much of its funds and energies to an exten-

---

*Virginia.* During the course of the litigation the names of successive holders of that office have been substituted as party respondent. See Supreme Court Rule 48, par. 3, as amended. 366 U. S. 979.

sive program of assisting certain kinds of litigation on behalf of its declared purposes. For more than 10 years, the Virginia Conference has concentrated upon financing litigation aimed at ending racial segregation in the public schools of the Commonwealth.

The Conference ordinarily will finance only cases in which the assisted litigant retains an NAACP staff lawyer to represent him.[4] The Conference maintains a legal staff of 15 attorneys, all of whom are Negroes and members of the NAACP. The staff is elected at the Conference's annual convention. Each legal staff member must agree to abide by the policies of the NAACP, which, insofar as they pertain to professional services, limit the kinds of litigation which the NAACP will assist. Thus the NAACP will not underwrite ordinary damages actions, criminal actions in which the defendant raises no question of possible racial discrimination, or suits in which the plaintiff seeks separate but equal rather than fully desegregated public school facilities. The staff decides whether a litigant, who may or may not be an NAACP member, is entitled to NAACP assistance. The Conference defrays all expenses of litigation in an assisted case, and usually, although not always, pays each lawyer on the case a per diem fee not to exceed $60, plus out-of-pocket expenses. The assisted litigant receives no money from the Conference or the staff lawyers. The staff member may not accept, from the litigant or any other source, any other compensation for his services in an NAACP-assisted case. None of the staff receives a salary or retainer from the NAACP; the per diem fee is paid only for professional services in a particular case. This per diem payment is

---

[4] However, the record contains two instances where Negro litigants had retained attorneys, not on the legal staff, prior to seeking financial assistance from the Conference. The Conference rendered substantial financial assistance in both cases. In one case the Conference paid the attorney's fee.

smaller than the compensation ordinarily received for equivalent private professional work. The actual conduct of assisted litigation is under the control of the attorney, although the NAACP continues to be concerned that the outcome of the lawsuit should be consistent with NAACP's policies already described. A client is free at any time to withdraw from an action.

The members of the legal staff of the Virginia Conference and other NAACP or Defense Fund lawyers called in by the staff to assist are drawn into litigation in various ways. One is for an aggrieved Negro to apply directly to the Conference or the legal staff for assistance. His application is referred to the Chairman of the legal staff. The Chairman, with the concurrence of the President of the Conference, is authorized to agree to give legal assistance in an appropriate case. In litigation involving public school segregation, the procedure tends to be different. Typically, a local NAACP branch will invite a member of the legal staff to explain to a meeting of parents and children the legal steps necessary to achieve desegregation. The staff member will bring printed forms to the meeting authorizing him, and other NAACP or Defense Fund attorneys of his designation, to represent the signers in legal proceedings to achieve desegregation. On occasion, blank forms have been signed by litigants, upon the understanding that a member or members of the legal staff, with or without assistance from other NAACP lawyers, or from the Defense Fund, would handle the case. It is usual, after obtaining authorizations, for the staff lawyer to bring into the case the other staff members in the area where suit is to be brought, and sometimes to bring in lawyers from the national organization or the Defense Fund.[5] In effect, then, the prospec-

---

[5] The Defense Fund, which is not involved in the present phase of the litigation, is a companion body to the NAACP. It is also a nonprofit New York corporation licensed to do business in Virginia,

tive litigant retains not so much a particular attorney as the "firm" of NAACP and Defense Fund lawyers, which has a corporate reputation for expertness in presenting and arguing the difficult questions of law that frequently arise in civil rights litigation.

These meetings are sometimes prompted by letters and bulletins from the Conference urging active steps to fight segregation. The Conference has on occasion distributed to the local branches petitions for desegregation to be signed by parents and filed with local school boards, and advised branch officials to obtain, as petitioners, persons willing to "go all the way" in any possible litigation that may ensue. While the Conference in these ways encourages the bringing of lawsuits, the plaintiffs in particular actions, so far as appears, make their own decisions to become such.[6]

---

and has the same general purposes and policies as the NAACP. The Fund maintains a legal staff in New York City and retains regional counsel elsewhere, one of whom is in Virginia. Social scientists, law professors and law students throughout the country donate their services to the Fund without compensation. When requested by the NAACP, the Defense Fund provides assistance in the form of legal research and counsel.

[6] Seven persons who were or had been plaintiffs in Virginia public school suits did testify that they were unaware of their status as plaintiffs and ignorant of the nature and purpose of the suits to which they were parties. It does not appear, however, that the NAACP had been responsible for their involvement in litigation. These plaintiffs testified that they had attended meetings of parents without grasping the meaning of the discussions, had signed authorizations either without reading or without understanding them, and thereafter had paid no heed to the frequent meetings of parents called to keep them abreast of legal developments. They also testified that they were not accustomed to read newspapers or listen to the radio. Thus they seem to have had little grasp of what was going on in the communities. Two of these seven plaintiffs had been persuaded to sign authorizations by their own children, who had picked up forms at NAACP meetings. Five were plaintiffs in the Prince Edward County

Statutory regulation of unethical and nonprofessional conduct by attorneys has been in force in Virginia since 1849. These provisions outlaw, *inter alia,* solicitation of legal business in the form of "running" or "capping." Prior to 1956, however, no attempt was made to proscribe under such regulations the activities of the NAACP, which had been carried on openly for many years in substantially the manner described. In 1956, however, the legislature amended, by the addition of Chapter 33, the provisions of the Virginia Code forbidding solicitation of legal business by a "runner" or "capper" to include, in the definition of "runner" or "capper," an agent for an individual or organization which retains a lawyer in connection with an action to which it is not a party and in which it has no pecuniary right or liability.[7]

school litigation, in which 186 persons were joined as plaintiffs. See *NAACP* v. *Patty,* 159 F. Supp. 503, 517 (D. C. E. D. Va. 1958).

[7] Code of Virginia, 1950, §§ 54–74, 54–78, and 54–79, as amended by Acts of 1956, Ex. Sess., c. 33 (Repl. Vol. 1958), read in pertinent part as follows (amendments in italics):

"§ 54–74. . . . If the Supreme Court of Appeals, or any court of record of this State, observes, or if complaint, verified by affidavit, be made by any person to such court of any malpractice or of any unlawful or dishonest or unworthy or corrupt or unprofessional conduct on the part of any attorney, or that any person practicing law is not duly licensed to practice in this State, such court shall, if it deems the case a proper one for such action, issue a rule against such attorney or other person to show cause why his license to practice law shall not be revoked or suspended.

.        .        .        .        .

"Upon the hearing, if the defendant be found guilty by the court, his license to practice law in this State shall be revoked, or suspended for such time as the court may prescribe; provided, that the court, in lieu of revocation or suspension, may, in its discretion, reprimand such attorney.

.        .        .        .        .

" 'Any malpractice, or any unlawful or dishonest or unworthy or corrupt or unprofessional conduct,' as used in this section, shall be construed to include the improper solicitation of any legal or profes-

The Virginia Supreme Court of Appeals held that the chapter's purpose "was to strengthen the existing statutes to further control the evils of solicitation of legal business . . . ." 202 Va., at 154, 116 S. E. 2d, at 65. The

sional business or employment, either directly or indirectly, *or the acceptance of employment, retainer, compensation or costs from any person, partnership, corporation, organization or association with knowledge that such person, partnership, corporation, organization or association has violated any provision of article 7 of this chapter* [§§ *54–78 to 54–83.1*], or the failure, without sufficient cause, within a reasonable time after demand, of any attorney at law, to pay over and deliver to the person entitled thereto, any money, security or other property, which has come into his hands as such attorney; *provided, however, that nothing contained in this article shall be construed to in any way prohibit any attorney from accepting employment to defend any person, partnership, corporation, organization or association accused of violating the provisions of article 7 of this chapter.*

.    .    .    .

"§ 54–78. . . . (1) A 'runner' or 'capper' is any person, corporation, partnership or association acting in any manner or in any capacity as an agent for an attorney at law within this State *or for any person, partnership, corporation, organization or association which employs, retains or compensates any attorney at law in connection with any judicial proceeding in which such person, partnership, corporation, organization or association is not a party and in which it has no pecuniary right or liability,* in the solicitation or procurement of business for such attorney at law \* *or for such person, partnership, corporation, organization or association in connection with any judicial proceedings for which such attorney or such person, partnership, corporation, organization or association is employed, retained or compensated.*

*"The fact that any person, partnership, corporation, organization or association is a party to any judicial proceeding shall not authorize any runner or capper to solicit or procure business for such person, partnership, corporation, organization or association or any attorney at law employed, retained or compensated by such person, partnership, corporation, organization or association.*

"(2) An 'agent' is one who represents another in dealing with a third person or persons. [*Footnote 7 continued on p. 425*]

court held that the activities of NAACP, the Virginia
Conference, the Defense Fund, and the lawyers fur-
nished by them, fell within, and could constitutionally
be proscribed by, the chapter's expanded definition of
improper solicitation of legal business, and also violated
Canons 35 and 47 of the American Bar Association's
Canons of Professional Ethics, which the court had

---

"§ 54–79. ... It shall be unlawful for any person, corporation, part-
nership or association to act as a runner or capper * *as defined in*
§ *54–78* to solicit any business for * *an attorney at law or such person,
partnership, corporation, organization or association,* in and about the
State prisons, county jails, city jails, city prisons, or other places of
detention of persons, city receiving hospitals, city and county receiv-
ing hospitals, county hospitals, police courts, * *county* courts, munic-
ipal courts, * courts *of record,* or in any public institution or in any
public place or upon any public street or highway or in and about
private hospitals, sanitariums or in and about any private institution
or upon private property of any character whatsoever." Code of Vir-
ginia, 1950, §§ 54–82, 54–83.1, as amended (Repl. Vol. 1958), provide:

"§ 54.82. Penalty for violation.—Any person, corporation, part-
nership or association violating any of the provisions of this article
shall be guilty of a misdemeanor, and shall be punishable by a fine
of not less than one hundred dollars nor more than five hundred
dollars, or by imprisonment for not less than one month nor more
than six months, or by both such fine and imprisonment. . . .

"§ 54–83.1. Injunction against running, capping, soliciting and
maintenance.—The Commonwealth's attorney, or any person, firm or
corporation against whom any claim for damage to property or dam-
ages for personal injuries or for death resulting therefrom, is or has
been asserted, may maintain a suit in equity against any person who
has solicited employment for himself or has induced another to solicit
or encourage his employment, or against any person, firm, partner-
ship or association which has acted for another in the capacity of a
runner or capper or which has been stirring up litigation in such a
way as to constitute maintenance whether such solicitation was suc-
cessful or not, to enjoin and permanently restrain such person, his
agents, representatives and principals from soliciting any such claims
against any person, firm or corporation subsequent to the date of the
injunction."

adopted in 1938.[8]   Specifically the court held that, under
the expanded definition, such activities on the part of
NAACP, the Virginia Conference, and the Defense Fund
constituted "fomenting and soliciting legal business in
which they are not parties and have no pecuniary right
or liability, and which they channel to the enrichment of
certain lawyers employed by them, at no cost to the
litigants and over which the litigants have no control."
202 Va., at 155; 116 S. E. 2d, at 66.   Finally, the court
restated the decree of the Richmond Circuit Court.   We
have excerpted the pertinent portion of the court's hold-
ing in the margin.[9]

---

[8] 171 Va., pp. xxxii–xxxiii, xxxv (1938).   Canon 35 reads in part as
follows:

"*Intermediaries.*—The professional services of a lawyer should not
be controlled or exploited by any lay agency, personal or corporate,
which intervenes between client and lawyer.   A lawyer's responsi-
bilities and qualifications are individual.   He should avoid all rela-
tions which direct the performance of his duties by or in the interest
of such intermediary.   A lawyer's relation to his client should be
personal, and the responsibility should be direct to the client.   Chari-
table societies rendering aid to the indigent are not deemed such
intermediaries."   Canon 47 reads as follows:

"*Aiding the Unauthorized Practice of Law.*—No lawyer shall per-
mit his professional services, or his name, to be used in aid of, or to
make possible, the unauthorized practice of law by any lay agency,
personal or corporate."

[9] "[T]he solicitation of legal business by the appellants, their
officers, members, affiliates, voluntary workers and attorneys, as shown
by the evidence, violates chapter 33 and the canons of legal ethics;

". . . attorneys who accept employment by appellants to represent
litigants in suits solicited by the appellants, or those associated with
them, are violating chapter 33 and the canons of legal ethics;

.        .        .        .        .

". . . appellants and those associated with them may not be pro-
hibited from acquainting persons with what they believe to be their
legal rights and advising them to assert their rights by commencing
or further prosecuting a suit against the Commonwealth of Virginia,
any department, agency or political subdivision thereof, or any person

## I.

A jurisdictional question must first be resolved: whether the judgment below was "final" within the meaning of 28 U. S. C. § 1257. The three-judge Federal District Court retained jurisdiction of this case while an authoritative construction of Chapters 33 and 36 was being sought in the Virginia courts Cf. *Chicago* v. *Fieldcrest Dairies, Inc.,* 316 U. S. 168, 173. The question of our jurisdiction arises because, when the case was last here, we observed that such abstention to secure state court interpretation "does not, of course, involve the abdication [by the District Court] of federal jurisdiction, but only the postponement of its exercise . . . ." *Harrison* v. *NAACP,* 360 U. S. 167, 177. We meant simply that the District Court had properly retained jurisdiction, since a party has the right to return to the District Court, after obtaining the authoritative state court construction for which the court abstained, for a final determination of his claim. Where, however, the party remitted to the state courts elects to seek a complete and final adjudication of his rights in the state courts, the District Court's reservation of jurisdiction is purely formal, and does not impair our jurisdiction to review directly an otherwise final state court judgment. *Lassiter* v. *Northampton County Bd. of Elections,* 360 U. S. 45. We think it clear that petitioner made such an

---

acting as an officer or employee of such, but in so advising persons to commence or further prosecute such suits the appellants, or those associated with them, shall not solicit legal business for their attorneys or any particular attorneys; and

"(b) the appellants and those associated with them may not be prohibited from contributing money to persons to assist them in commencing or further prosecuting such suits, which have not been solicited by the appellants or those associated with them, and channeled by them to their attorneys or any other attorneys." 202 Va., at 164–165, 116 S. E. 2d, at 72.

election in the instant case, by seeking from the Richmond Circuit Court "a binding adjudication" of all its claims and a permanent injunction as well as declaratory relief, by making no reservation to the disposition of the entire case by the state courts, and by coming here directly on certiorari. Therefore, the judgment of the Virginia Supreme Court of Appeals was final, and the case is properly before us.

## II.

Petitioner challenges the decision of the Supreme Court of Appeals on many grounds. But we reach only one: that Chapter 33 as construed and applied abridges the freedoms of the First Amendment, protected against state action by the Fourteenth.[10] More specifically, petitioner claims that the chapter infringes the right of the NAACP and its members and lawyers to associate for the purpose of assisting persons who seek legal redress for infringements of their constitutionally guaranteed and other rights. We think petitioner may assert this right on its own behalf, because, though a corporation, it is directly engaged in those activities, claimed to be constitutionally protected, which the statute would curtail. Cf. *Grosjean* v. *American Press Co.,* 297 U. S. 233. We also think petitioner has standing to assert the corresponding rights of its members. See *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 458–460; *Bates* v. *City of Little Rock,* 361 U. S. 516, 523, n. 9; *Louisiana ex rel. Gremillion* v. *NAACP,* 366 U. S. 293, 296.

We reverse the judgment of the Virginia Supreme Court of Appeals. We hold that the activities of the NAACP, its affiliates and legal staff shown on this record are modes of expression and association protected by the First and

---

[10] Petitioner also claims that Chapter 33 as construed denies equal protection of the laws, and is so arbitrary and irrational as to deprive petitioner of property without due process of law.

Fourteenth Amendments which Virginia may not prohibit, under its power to regulate the legal profession, as improper solicitation of legal business violative of Chapter 33 and the Canons of Professional Ethics.[11]

## A.

We meet at the outset the contention that "solicitation" is wholly outside the area of freedoms protected by the First Amendment. To this contention there are two answers. The first is that a State cannot foreclose the exercise of constitutional rights by mere labels. The second is that abstract discussion is not the only species of communication which the Constitution protects; the First Amendment also protects vigorous advocacy, certainly of lawful ends, against governmental intrusion. *Thomas* v. *Collins,* 323 U. S. 516, 537; *Herndon* v. *Lowry,* 301 U. S. 242, 259–264. Cf. *Cantwell* v. *Connecticut,* 310 U. S. 296; *Stromberg* v. *California,* 283 U. S. 359, 369; *Terminiello* v. *Chicago,* 337 U. S. 1, 4. In the context of NAACP objectives, litigation is not a technique of resolving private differences; it is a means for achieving the lawful objectives of equality of treatment by all government, federal, state and local, for the members of the Negro community in this country. It is thus a form of political expression. Groups which find themselves unable to achieve their objectives through the ballot frequently turn to the courts.[12] Just as it was true of the

---

[11] It is unclear—and immaterial—whether the Virginia court's opinion is to be read as holding that NAACP's activities violated the Canons *because* they violated Chapter 33, or as reinforcing its holding that Chapter 33 was violated by finding an independent violation of the Canons. Our holding that petitioner's activities are constitutionally protected applies equally whatever the source of Virginia's attempted prohibition.

[12] Murphy, The South Counterattacks: The Anti-NAACP Laws, 12 W. Pol. Q. 371 (1959). See Bentley, The Process of Government:

opponents of New Deal legislation during the 1930's,[13] for example, no less is it true of the Negro minority today. And under the conditions of modern government, litigation may well be the sole practicable avenue open to a minority to petition for redress of grievances.

We need not, in order to find constitutional protection for the kind of cooperative, organizational activity disclosed by this record, whereby Negroes seek through lawful means to achieve legitimate political ends, subsume such activity under a narrow, literal conception of freedom of speech, petition or assembly. For there is no longer any doubt that the First and Fourteenth Amendments protect certain forms of orderly group activity. Thus we have affirmed the right "to engage in association for the advancement of beliefs and ideas." *NAACP* v. *Alabama, supra,* at 460. We have deemed privileged, under certain circumstances, the efforts of a union official to organize workers. *Thomas* v. *Collins, supra.* We have said that the Sherman Act does not apply to certain concerted activities of railroads "at least insofar as those activities comprised mere solicitation of governmental action with respect to the passage and enforcement of laws" because "such a construction of the Sherman Act would raise important constitutional questions," specifically, First Amendment questions. *Eastern R. Presidents Conference* v. *Noerr Motor Freight, Inc.,* 365 U. S.

---

A Study of Social Pressures (1908); Rosenblum, Law as a Political Instrument (1955); Peltason, Federal Courts in the Political Process (1955); Truman, The Governmental Process: Political Interests and Public Opinion (1955); Vose, The National Consumers' League and the Brandeis Brief, 1 Midw. J. of Pol. Sci. 267 (1957); Comment, Private Attorneys-General: Group Action in the Fight for Civil Liberties, 58 Yale L. J. 574 (1949).

[13] Cf. Opinion 148, Committee on Professional Ethics and Grievances, American Bar Association (1935), ruling that the Liberty League's program of assisting litigation challenging New Deal legislation did not constitute unprofessional conduct.

127, 138. And we have refused to countenance compelled disclosure of a person's political associations in language closely applicable to the instant case:

"Our form of government is built on the premise that every citizen shall have the right to engage in political expression and association. This right was enshrined in the First Amendment of the Bill of Rights. Exercise of these basic freedoms in America has traditionally been through the media of political associations. Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents. All political ideas cannot and should not be channeled into the programs of our two major parties. History has amply proved the virtue of political activity by minority, dissident groups . . . ." *Sweezy* v. *New Hampshire,* 354 U. S. 234, 250–251 (plurality opinion). Cf. *De Jonge* v. *Oregon,* 299 U. S. 353, 364–366.

The NAACP is not a conventional political party; but the litigation it assists, while serving to vindicate the legal rights of members of the American Negro community, at the same time and perhaps more importantly, makes possible the distinctive contribution of a minority group to the ideas and beliefs of our society. For such a group, association for litigation may be the most effective form of political association.

### B.

Our concern is with the impact of enforcement of Chapter 33 upon First Amendment freedoms. We start, of course, from the decree of the Supreme Court of Appeals. Although the action before it was one basically for declaratory relief, that court not only expounded the purpose and reach of the chapter but held concretely that certain of petitioner's activities had, and certain others had not,

violated the chapter. These activities had been explored in detail at the trial and were spread out plainly on the record. We have no doubt that the opinion of the Supreme Court of Appeals in the instant case was intended as a full and authoritative construction of Chapter 33 as applied in a detailed factual context. That construction binds us. For us, the words of Virginia's highest court are the words of the statute. *Hebert* v. *Louisiana,* 272 U. S. 312, 317. We are not left to speculate at large upon the possible implications of bare statutory language.

But it does not follow that this Court now has only a clear-cut task to decide whether the activities of the petitioner deemed unlawful by the Supreme Court of Appeals are constitutionally privileged. If the line drawn by the decree between the permitted and prohibited activities of the NAACP, its members and lawyers is an ambiguous one, we will not presume that the statute curtails constitutionally protected activity as little as possible. For standards of permissible statutory vagueness are strict in the area of free expression. See *Smith* v. *California,* 361 U. S. 147, 151; *Winters* v. *New York,* 333 U. S. 507, 509–510, 517–518; *Herndon* v. *Lowry,* 301 U. S. 242; *Stromberg* v. *California,* 283 U. S. 359; *United States* v. *C. I. O.,* 335 U. S. 106, 142 (Rutledge, J., concurring). Furthermore, the instant decree may be invalid if it prohibits privileged exercises of First Amendment rights whether or not the record discloses that the petitioner has engaged in privileged conduct. For in appraising a statute's inhibitory effect upon such rights, this Court has not hesitated to take into account possible applications of the statute in other factual contexts besides that at bar. *Thornhill* v. *Alabama,* 310 U. S. 88, 97–98; *Winters* v. *New York, supra,* at 518–520. Cf. *Staub* v. *City of Baxley,* 355 U. S. 313. It makes no difference that the instant case was not a criminal prosecution and not based on a refusal to comply with a licensing requirement. The

objectionable quality of vagueness and overbreadth does not depend upon absence of fair notice to a criminally accused or upon unchanneled delegation of legislative powers, but upon the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application.[14] Cf. *Marcus* v. *Search Warrant,* 367 U. S. 717, 733. These freedoms are delicate and vulnerable, as well as supremely precious in our society. The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions. Cf. *Smith* v. *California, supra,* at 151–154; *Speiser* v. *Randall,* 357 U. S. 513, 526. Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity. *Cantwell* v. *Connecticut,* 310 U. S. 296, 311.

We read the decree of the Virginia Supreme Court of Appeals in the instant case as proscribing any arrangement by which prospective litigants are advised to seek the assistance of particular attorneys. No narrower reading is plausible. We cannot accept the reading suggested on behalf of the Attorney General of Virginia on the second oral argument that the Supreme Court of Appeals construed Chapter 33 as proscribing control only of the actual litigation by the NAACP after it is instituted. In the first place, upon a record devoid of any evidence of interference by the NAACP in the actual conduct of litigation, or neglect or harassment of clients, the court nevertheless held that petitioner, its members, agents and staff attorneys had practiced criminal solicitation. Thus, simple referral to or recommendation of a lawyer may be solicitation within the meaning of Chapter 33. In the second place, the decree does not seem to rest on the fact

---

[14] Amsterdam, Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U. of Pa. L. Rev. 67, 75–76, 80–81, 96–104 (1960).

that the attorneys were organized as a staff and paid by petitioner. The decree expressly forbids solicitation on behalf of "any particular attorneys" in addition to attorneys retained or compensated by the NAACP. In the third place, although Chapter 33 purports to prohibit only solicitation by attorneys or their "agents," it defines agent broadly as anyone who "represents" another in his dealings with a third person. Since the statute appears to depart from the common-law concept of the agency relationship and since the Virginia court did not clarify the statutory definition, we cannot say that it will not be applied with the broad sweep which the statutory language imports.

We conclude that under Chapter 33, as authoritatively construed by the Supreme Court of Appeals, a person who advises another that his legal rights have been infringed and refers him to a particular attorney or group of attorneys (for example, to the Virginia Conference's legal staff) for assistance has committed a crime, as has the attorney who knowingly renders assistance under such circumstances. There thus inheres in the statute the gravest danger of smothering all discussion looking to the eventual institution of litigation on behalf of the rights of members of an unpopular minority. Lawyers on the legal staff or even mere NAACP members or sympathizers would understandably hesitate, at an NAACP meeting or on any other occasion, to do what the decree purports to allow, namely, acquaint "persons with what they believe to be their legal rights and . . . [advise] them to assert their rights by commencing or further prosecuting a suit . . . ." For if the lawyers, members or sympathizers also appeared in or had any connection with any litigation supported with NAACP funds contributed under the provision of the decree by which the NAACP is not prohibited "from contributing money to persons to assist them in commencing or further prosecuting such

suits," they plainly would risk (if lawyers) disbarment proceedings and, lawyers and nonlawyers alike, criminal prosecution for the offense of "solicitation," to which the Virginia court gave so broad and uncertain a meaning. It makes no difference whether such prosecutions or proceedings would actually be commenced. It is enough that a vague and broad statute lends itself to selective enforcement against unpopular causes. We cannot close our eyes to the fact that the militant Negro civil rights movement has engendered the intense resentment and opposition of the politically dominant white community of Virginia; [15] litigation assisted by the NAACP has been bitterly fought.[16] In such circumstances, a statute

[15] See *NAACP* v. *Patty,* 159 F. Supp. 503, 516–517 (D. C. E. D. Va. 1958); *Davis* v. *County School Board,* 149 F. Supp. 431, 438–439 (D. C. E. D. Va. 1957), rev'd on other grounds *sub nom. Allen* v. *County School Board,* 249 F. 2d 462 (C. A. 4th Cir.); Muse, Virginia's Massive Resistance (1961), *passim.*

[16] See, *e. g., County School Bd.* v. *Thompson,* 240 F. 2d 59, 64 (C. A. 4th Cir. 1956) (conduct of defendant termed a "clear manifestation of an attitude of intransigence . . ."); *James* v. *Duckworth,* 170 F. Supp. 342, 350 (D. C. E. D. Va. 1959), aff'd, 267 F. 2d 224 (C. A. 4th Cir.); *Allen* v. *County School Bd.,* 266 F. 2d 507 (C. A. 4th Cir. 1959); *Allen* v. *County School Bd.,* 198 F. Supp. 497, 502 (D. C. E. D. Va. 1961). Most NAACP-assisted litigation in Virginia in recent years has been litigation challenging public school segregation. The sheer mass of such (and related) litigation is an indication of the intensity of the struggle: ALEXANDRIA: *Jones* v. *School Bd.,* 179 F. Supp. 280 (D. C. E. D. Va. 1959); *Jones* v. *School Bd.,* 278 F. 2d 72 (C. A. 4th Cir. 1960); ARLINGTON: *County School Bd.* v. *Thompson,* 240 F. 2d 59 (C. A. 4th Cir. 1956); *Thompson* v. *County School Bd.,* 144 F. Supp. 239 (D. C. E. D. Va. 1956); 159 F. Supp. 567 (D. C. E. D. Va. 1957); 166 F. Supp. 529 (D. C. E. D. Va. 1958); 252 F. 2d 929 (C. A. 4th Cir. 1958); 2 Race Rel. 810 (D. C. E. D. Va. 1957); 4 Race Rel. 609 (D. C. E. D. Va. 1959); 4 Race Rel. 880 (D. C. E. D. Va. 1959); *Hamm* v. *School Bd. of Arlington Co.,* 263 F. 2d 226 (C. A. 4th Cir. 1959); 264 F. 2d 945 (C. A. 4th Cir. 1959). CHARLOTTES-VILLE: *School Bd.* v. *Allen,* 240 F. 2d 59 (C. A. 4th Cir. 1956); *Allen* v. *School Bd.,* 1 Race Rel. 886 (D. C. W. D. Va. 1956); 2 Race

broadly curtailing group activity leading to litigation may easily become a weapon of oppression, however even-handed its terms appear. Its mere existence could well freeze out of existence all such activity on behalf of the civil rights of Negro citizens.

---

Rel. 986 (D. C. W. D. Va. 1957); 3 Race Rel. 937 (D. C. W. D. Va. 1958); 4 Race Rel. 881 (D. C. W. D. Va. 1959); 263 F. 2d 295 (C. A. 4th Cir. 1959); 203 F. Supp. 225 (D. C. W. D. Va. 1961); *Dodson* v. *School Bd.,* 289 F. 2d 439 (C. A. 4th Cir. 1961); *Dillard* v. *School Bd.,* 308 F. 2d 920 (C. A. 4th Cir. 1962). FAIRFAX COUNTY: *Blackwell* v. *Fairfax Co. School Bd.,* 5 Race Rel. 1056 (D. C. E. D. Va. 1960). FLOYD COUNTY: *Walker* v. *Floyd Co. School Bd.,* 5 Race Rel. 1060 (D. C. W. D. Va. 1960); 5 Race Rel. 714 (D. C. W. D. Va. 1960). GRAYSON COUNTY: *Goins* v. *County School Bd.,* 186 F. Supp. 753 (D. C. W. D. Va. 1960); 282 F. 2d 343 (C. A. 4th Cir. 1960). NORFOLK: *Beckett* v. *School Bd.,* 2 Race Rel. 337 (D. C. E. D. Va. 1957); 148 F. Supp. 430 (D. C. E. D. Va. 1957); 3 Race Rel. 942–964 (D. C. E. D. Va. 1958); 260 F. 2d 18 (C. A. 4th Cir. 1958); 246 F. 2d 325 (C. A. 4th Cir. 1957); 181 F. Supp. 870 (D. C. E. D. Va. 1959); 185 F. Supp. 459 (D. C. E. D. Va. 1959); *Farley* v. *Turner,* 281 F. 2d 131 (C. A. 4th Cir. 1960); *Hill* v. *School Bd.,* 282 F. 2d 473 (C. A. 4th Cir. 1960); *James* v. *Duckworth,* 170 F. Supp. 342 (D. C. E. D. Va. 1959); 267 F. 2d 224 (C. A. 4th Cir. 1959); *Adkinson* v. *School Bd. of Newport News,* 3 Race Rel. 938 (D. C. E. D. Va. 1958); *Adkins* v. *School Bd. of Newport News,* 148 F. Supp. 430 (D. C. E. D. Va. 1957); 2 Race Rel. 334 (D. C. E. D. Va. 1957.); 246 F. 2d 325 (C. A. 4th Cir. 1957); *Harrison* v. *Day,* 200 Va. 439, 106 S. E. 2d 636 (1959); *James* v. *Almond,* 170 F. Supp. 331 (D. C. E. D. Va. 1959). PRINCE EDWARD COUNTY: *Davis* v. *School Bd. of Prince Edward Co.,* 347 U. S. 483; 349 U. S. 294; 1 Race Rel. 82 (D. C. E. D. Va. 1955); 142 F. Supp. 616 (D. C. E. D. Va. 1956); 149 F. Supp. 431 (D. C. E. D. Va. 1957); *Allen* v. *School Bd.,* 164 F. Supp. 786 (D. C. E. D. Va. 1958); 249 F. 2d 462 (C. A. 4th Cir. 1957); 266 F. 2d 507 (C. A. 4th Cir. 1959); 6 Race Rel. 432 (D. C. E. D. Va. 1961); 198 F. Supp. 497 (D. C. E. D. Va. 1961); Southern School News, Aug. 1962, p. 1. PULASKI COUNTY: *Crisp* v. *Pulaski Co. School Bd.,* 5 Race Rel. 721 (D. C. W. D. Va. 1960). RICHMOND: *Calloway* v. *Farley,* 2 Race Rel. 1121 (D. C. E. D. Va. 1957);

It is apparent, therefore, that Chapter 33 as construed limits First Amendment freedoms. As this Court said in *Thomas* v. *Collins,* 323 U. S. 516, 537, " 'Free trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts." Thomas was convicted for delivering a speech in connection with an impending union election under National Labor Relations Board auspices, without having first registered as a "labor organizer." He urged workers to exercise their rights under the National Labor Relations Act and join the union he represented. This Court held that the registration requirement as applied to his activities was constitutionally invalid. In the instant case, members of the NAACP urged Negroes aggrieved by the allegedly unconstitutional segregation of public schools in Virginia to exercise their legal rights and to retain members of the Association's legal staff. Like Thomas, the Association and its members were advocating lawful means of vindicating legal rights.

We hold that Chapter 33 as construed violates the Fourteenth Amendment by unduly inhibiting protected freedoms of expression and association. In so holding, we reject two further contentions of respondents. The first is that the Virginia Supreme Court of Appeals has guaranteed free expression by expressly confirming petitioner's right to continue its advocacy of civil-rights litigation. But in light of the whole decree of the court, the guarantee is of purely speculative value. As construed by the Court, Chapter 33, at least potentially, prohibits every

---

*Warden* v. *Richmond School Bd.,* 3 Race Rel. 971 (D. C. E. D. Va. 1958). WARREN COUNTY: *Kilby* v. *County School Bd.,* 3 Race Rel. 972–973 (D. C. W. D. Va. 1958); *County School Bd.* v. *Kilby,* 259 F. 2d 497 (C A. 4th Cir. 1958).

Despite this volume of litigation, only ½ of 1% of Virginia's Negro public school pupils attend school with whites. Southern School News, Sept. 1962, p. 3.

cooperative activity that would make advocacy of litigation meaningful. If there is an internal tension between proscription and protection in the statute, we cannot assume that, in its subsequent enforcement, ambiguities will be resolved in favor of adequate protection of First Amendment rights. Broad prophylactic rules in the area of free expression are suspect. See, *e. g., Near* v. *Minnesota,* 283 U. S. 697; *Shelton* v. *Tucker,* 364 U. S. 479; *Louisiana ex rel. Gremillion* v. *NAACP,* 366 U. S. 293. Cf. *Schneider* v. *Irvington,* 308 U. S. 147, 162. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.

## C.

The second contention is that Virginia has a subordinating interest in the regulation of the legal profession, embodied in Chapter 33, which justifies limiting petitioner's First Amendment rights. Specifically, Virginia contends that the NAACP's activities in furtherance of litigation, being "improper solicitation" under the state statute, fall within the traditional purview of state regulation of professional conduct. However, the State's attempt to equate the activities of the NAACP and its lawyers with common-law barratry, maintenance and champerty,[17] and to outlaw them accordingly, cannot obscure the serious encroachment worked by Chapter 33 upon protected freedoms of expression. The decisions of this Court have consistently held that only a compelling state interest in the regulation of a subject within the State's constitutional power to regulate can justify limiting First Amendment freedoms. Thus it is no answer to the constitutional claims asserted by petitioner to say, as the Virginia Supreme Court of Appeals has said, that the

---

[17] See 4 Blackstone, Commentaries, 134–136. See generally Radin, Maintenance by Champerty, 24 Cal. L. Rev. 48 (1935).

purpose of these regulations was merely to insure high professional standards and not to curtail free expression. For a State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights. See *Schware* v. *Board of Bar Examiners,* 353 U. S. 232; *Konigsberg* v. *State Bar,* 353 U. S. 252. Cf. *In re Sawyer,* 360 U. S. 622. In *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 461, we said, "In the domain of these indispensable liberties, whether of speech, press, or association, the decisions of this Court recognize that abridgment of such rights, even though unintended, may inevitably follow from varied forms of governmental action." Later, in *Bates* v. *Little Rock,* 361 U. S. 516, 524, we said, "[w]here there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling." Most recently, in *Louisiana ex rel. Gremillion* v. *NAACP,* 366 U. S. 293, 297, we reaffirmed this principle: ". . . regulatory measures . . . no matter how sophisticated, cannot be employed in purpose or in effect to stifle, penalize, or curb the exercise of First Amendment rights."

However valid may be Virginia's interest in regulating the traditionally illegal practices of barratry, maintenance and champerty, that interest does not justify the prohibition of the NAACP activities disclosed by this record. Malicious intent was of the essence of the common-law offenses of fomenting or stirring up litigation.[18] And whatever may be or may have been true of suits against

---

[18] See, *e. g., Commonwealth* v. *McCulloch,* 15 Mass. 227 (1818); *Brown* v. *Beauchamp,* 5 T. B. Mon. 413 (Ky. 1827); Perkins, Criminal Law, 449–454 (1957); Note, 3 Race Rel. 1257–1259 (1958).

The earliest regulation of solicitation of legal business in England was aimed at the practice whereby holders of claims to land conveyed them to great feudal lords, who used their power or influence to harass the titleholders. See Winfield, The History of Conspiracy and Abuse of Legal Procedure, 152 (1921).

government in other countries, the exercise in our own, as in this case, of First Amendment rights to enforce constitutional rights through litigation, as a matter of law, cannot be deemed malicious. Even more modern, subtler regulations of unprofessional conduct or interference with professional relations, not involving malice, would not touch the activities at bar; regulations which reflect hostility to stirring up litigation have been aimed chiefly at those who urge recourse to the courts for private gain, serving no public interest.[19] Hostility still exists to stir-

---

[19] See Comment: A Critical Analysis of Rules Against Solicitation by Lawyers, 25 U. of Chi. L. Rev. 674 (1958). But truly nonpecuniary arrangements involving the solicitation of legal business have been frequently upheld. See *In re Ades*, 6 F. Supp. 467 (D. C. D. Md. 1934) (lawyer's volunteering his services to a litigant, without being asked, held not unprofessional where "important issues" were at stake); *Gunnels* v. *Atlanta Bar Assn.*, 191 Ga. 366, 12 S. E. 2d 602 (1940) (arrangement whereby a local bar association publicly offered to represent, free of charge, persons victimized by usurers, upheld). Of particular pertinence to the instant case is Opinion 148, *supra*, note 13. In the 1930's, a National Lawyers Committee was formed under the auspices of the Liberty League. The Committee proposed (1) to prepare and disseminate through the public media of communications opinions on the constitutionality of state and federal legislation (it appears, particularly New Deal legislation); (2) to offer counsel, without fee or charge, to anyone financially unable to retain counsel who felt that such legislation was violating his constitutional rights. The ABA's Committee on Professional Ethics and Grievances upheld the arrangement. Opinion 148, Opinions of the Committee on Professional Ethics and Grievances, American Bar Association, 308–312 (1957); see Comment, 36 Col. L. Rev. 993.

Also, for example, the American Civil Liberties Union has for many years furnished counsel in many cases in many different parts of the country, without governmental interference. Although this intervention is mostly in the form of *amicus curiae* briefs, occasionally counsel employed by the Union appears directly on behalf of the litigant. See Comment, Private Attorneys-General: Group Action in the Fight for Civil Liberties, 58 Yale L. J. 574, 576 (1949); ACLU Report on Civil Liberties 1951–1953, pp. 9–10.

ring up private litigation where it promotes the use of legal machinery to oppress: as, for example, to sow discord in a family; [20] to expose infirmities in land titles, as by hunting up claims of adverse possession; [21] to harass large companies through a multiplicity of small claims; [22] or to oppress debtors as by seeking out unsatisfied judgments.[23] For a member of the bar to participate, directly or through intermediaries, in such misuses of the legal process is conduct traditionally condemned as injurious to the public. And beyond this, for a lawyer to attempt to reap gain by urging another to engage in private litigation has also been condemned: that seems to be the import of Canon 28, which the Virginia Supreme Court of Appeals has adopted as one of its Rules.[24]

Objection to the intervention of a lay intermediary, who may control litigation or otherwise interfere with the rendering of legal services in a confidential relationship, also derives from the element of pecuniary gain. Fearful of dangers thought to arise from that element, the courts of several States have sustained regulations aimed

---

[20] See Encouraging Divorce Litigation as Ground for Disbarment or Suspension, 9 A. L. R. 1500 (1920); "Heir-hunting" as Ground for Disciplinary Action Against Attorney, 171 A. L. R. 351, 352–355 (1947).

[21] See *Backus* v. *Byron*, 4 Mich. 535, 551–552 (1857).

[22] See *Matter of Clark*, 184 N. Y. 222, 77 N. E. 1 (1906); *Gammons* v. *Johnson*, 76 Minn. 76, 78 N. W. 1035 (1899).

[23] See *Petition of Hubbard*, 267 S. W. 2d 743 (Ky. Ct. App. 1954).

[24] See 171 Va., p. xxix, following the American Bar Association's Canons of Professional Ethics, No. 28: "It is unprofessional for a lawyer to volunteer advice to bring a lawsuit, except in rare cases where ties of blood, relationship or trust make it his duty to do so. . . . It is disreputable . . . to breed litigation by seeking out those with claims for personal injuries or those having any other grounds of action in order to secure them as clients, or to employ agents or runners for like purposes . . . ."

at these activities.[25]   We intimate no view one way or the other as to the merits of those decisions with respect to the particular arrangements against which they are directed.   It is enough that the superficial resemblance in form between those arrangements and that at bar cannot obscure the vital fact that here the entire arrangement employs constitutionally privileged means of expression to secure constitutionally guaranteed civil rights.[26]   There

---

[25] See *People ex rel. Courtney* v. *Asssociation of Real Estate Tax-payers*, 354 Ill. 102, 187 N. E. 823 (1933) (Association to contest constitutionality of tax statutes in which parties and Association attorneys had large sums of money at stake) ; *In the Matter of Maclub of America, Inc.*, 295 Mass: 45, 3 N. E. 2d 272 (1936) (motorists' association recommended and paid the fees of lawyers to prosecute or defend claims on behalf of motorist members) ; see also *People ex rel. Chicago Bar Assn.* v. *Chicago Motor Club*, 362 Ill. 50, 199 N. E. 1 (1935).   One aspect of the lay intermediary problem which involved the absence of evidence of palpable control or interference was an arrangement adopted by the Brotherhood of Railroad Trainmen in 1930 under which union members having claims under the Federal Employers' Liability Act were induced to retain lawyers selected by the Brotherhood and to make 25% contingent fee agreements with such lawyers.   The arrangement was struck down by several state courts.   To the courts which condemned the arrangement it appeared in practical effect to confer a monopoly of FELA legal business upon lawyers chosen by the Brotherhood.   These courts also saw it as tending to empower the Brotherhood to exclude lawyers from participation in a lucrative practice, and to cause the loyalties of the union-recommended lawyers to be divided between the union and their clients.   *E. g., Hildebrand* v. *State Bar*, 36 Cal. 2d 504, 225 P. 2d 508 (1950); *Doughty* v. *Grills*, 37 Tenn. App. 63, 260 S. W. 2d 379 (1952); *In re Brotherhood of Railroad Trainmen*, 13 Ill. 2d 391, 150 N. E. 2d 163 (1958); see Student Symposium, 107 U. of Pa. L. Rev. 387 (1959); 11 Stan. L. Rev. 394 (1959).   These decisions have been vigorously criticized.   See Traynor, J., dissenting in *Hildebrand, supra;* Drinker, Legal Ethics, 161–167 (1953).

[26] Compare Opinion 148, *supra,* n. 13, 19, at 312 (1957): "The question presented, with its implications, involves problems of political, social and economic character that have long since assumed

has been no showing of a serious danger here of professionally reprehensible conflicts of interest which rules against solicitation frequently seek to prevent. This is so partly because no monetary stakes are involved, and so there is no danger that the attorney will desert or subvert the paramount interests of his client to enrich himself or an outside sponsor. And the aims and interests of NAACP have not been shown to conflict with those of its members and nonmember Negro litigants; compare *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 459, where we said:

> "[the NAACP] and its members are in every practical sense identical. The Association, which provides in its constitution that '[a]ny person who is in accordance with [its] principles and policies . . .' may become a member, is but the medium through which its individual members seek to make more effective the expression of their own views." See also *Harrison* v. *NAACP,* 360 U. S. 167, 177.

Resort to the courts to seek vindication of constitutional rights is a different matter from the oppressive, malicious, or avaricious use of the legal process for purely private gain. Lawsuits attacking racial discrimination, at least in Virginia, are neither very profitable nor very popular. They are not an object of general competition among Virginia lawyers; [27] the problem is rather one of an apparent dearth of lawyers who are willing to undertake such litigation. There has been neither claim nor

the proportions of national issues, on one side or the other which multitudes of patriotic citizens have aligned themselves. These issues transcend the range of professional ethics."

[27] Improper competition among lawyers is one of the important considerations relied upon to justify regulations against solicitation. See Note, Advertising, Solicitation and Legal Ethics, 7 Vand. L. Rev. 677, 684 (1954).

proof that any assisted Negro litigants have desired, but have been prevented from retaining, the services of other counsel.   We realize that an NAACP lawyer must derive personal satisfaction from participation in litigation on behalf of Negro rights, else he would hardly be inclined to participate at the risk of financial sacrifice.   But this would not seem to be the kind of interest or motive which induces criminal conduct.

We conclude that although the petitioner has amply shown that its activities fall within the First Amendment's protections, the State has failed to advance any substantial regulatory interest, in the form of substantive evils flowing from petitioner's activities, which can justify the broad prohibitions which it has imposed.   Nothing that this record shows as to the nature and purpose of NAACP activities permits an inference of any injurious intervention in or control of litigation which would constitutionally authorize the application of Chapter 33 to those activities.   A fortiori, nothing in this record justifies the breadth and vagueness of the Virginia Supreme Court of Appeals' decree.

A final observation is in order.   Because our disposition is rested on the First Amendment as absorbed in the Fourteenth, we do not reach the considerations of race or racial discrimination which are the predicate of petitioner's challenge to the statute under the Equal Protection Clause.   That the petitioner happens to be engaged in activities of expression and association on behalf of the rights of Negro children to equal opportunity is constitutionally irrelevant to the ground of our decision. The course of our decisions in the First Amendment area makes plain that its protections would apply as fully to those who would arouse our society against the objectives of the petitioner.   See, e. g., Near v. Minnesota, 283 U. S. 697; Terminiello v. Chicago, 337 U. S. 1; Kunz v. New York, 340 U. S. 290.   For the Constitution protects ex-

pression and association without regard to the race, creed, or political or religious affiliation of the members of the group which invokes its shield, or to the truth, popularity, or social utility of the ideas and beliefs which are offered.

*Reversed.*

MR. JUSTICE DOUGLAS, concurring.

While I join the opinion of the Court, I add a few words. This Virginia Act is not applied across the board to all groups that use this method of obtaining and managing litigation, but instead reflects a legislative purpose to penalize the N. A. A. C. P. because it promotes desegregation of the races. Our decision in *Brown* v. *Board of Education,* 347 U. S. 483, holding that maintenance of public schools segregated by race violated the Equal Protection Clause of the Fourteenth Amendment, was announced May 17, 1954. The amendments to Virginia's code, here in issue, were enacted in 1956. Arkansas, Florida, Georgia, Mississippi, South Carolina, and Tennessee* also passed laws following our 1954 decision which brought within their barratry statutes attorneys paid by an organization such as the N. A. A. C. P. and representing litigants without charge.

The bill, here involved, was one of five that Virginia enacted "as parts of the general plan of massive resistance to the integration of schools of the state under the Supreme Court's decrees." Those are the words of Judge Soper, writing for the court in *N. A. A. C. P.* v. *Patty,* 159 F. Supp. 503, 515. He did not indulge in guesswork. He

---

*Ark. Stat. Ann., 1947 (Cum. Supp. 1961), §§ 41–703 to 41–713; Fla. Stat. Ann., 1944 (Cum. Supp. 1962), §§ 877.01 to 877.02; Ga. Code Ann., 1953 (Cum. Supp. 1961), §§ 26–4701, 26–4703; Miss. Code Ann., 1956, §§ 2049–01 to 2049–08; S. C. Code, 1952 (Cum. Supp. 1960), §§ 56–147 to 56–147.6; Tenn. Code Ann., 1956 (Cum. Supp. 1962), §§ 39–3405 to 39–3410.

reviewed the various steps taken by Virginia to resist our *Brown* decision, starting with the Report of the Gray Commission on November 11, 1955. *Id.,* at 512. He mentioned the "interposition resolution" passed by the General Assembly on February 1, 1956, the constitutional amendment made to carry out the recommendation of the Report of the Gray Commission, and the address of the Governor before the General Assembly that enacted the five laws, including the present one. *Id.,* at 513–515. These are too lengthy to repeat here. But they make clear the purpose of the present law—as clear a purpose to evade our prior decisions as was the legislation in *Lane* v. *Wilson,* 307 U. S. 268, another instance of a discriminatory state law. The fact that the contrivance used is subtle and indirect is not material to the question. "The Amendment nullifies sophisticated as well as simple-minded modes of discrimination." *Id.,* at 275. There we looked to the origins of the state law and the setting in which it operated to find its discriminatory nature. It is proper to do the same here.

Discrimination also appears on the face of this Act. The line drawn in § 54–78 is between an organization which has "no pecuniary right or liability" in a judicial proceeding and one that does. As we said in *N. A. A. C. P.* v. *Alabama,* 357 U. S. 449, 459, the N. A. A. C. P. and its members are "in every practical sense identical. The Association . . . is but the medium through which its individual members seek to make more effective the expression of their own views." Under the statute those who protect a "pecuniary right or liability" against unconstitutional invasions may indulge in "the solicitation . . . of business for . . . [an] attorney," while those who protect other civil rights may not. This distinction helps make clear the purpose of the legislation, which, as Judge Soper said, was part of the program of "massive resistance" against *Brown* v. *Board of Education, supra.*

Mr. Justice White, concurring in part and dissenting in part.

I agree that as construed by the Virginia Supreme Court, Chapter 33 does not proscribe only the actual control of litigation after its commencement, that it does forbid, under threat of criminal punishment, advising the employment of particular attorneys, and that as so construed the statute is unconstitutional.

Nor may the statute be saved simply by saying it prohibits only the "control" of litigation by a lay entity, for it seems to me that upon the record before us the finding of "control" by the Virginia Supreme Court must rest to a great extent upon an inference from the exercise of those very rights which this Court or the Virginia Supreme Court, or both, hold to be constitutionally protected: advising Negroes of their constitutional rights, urging them to institute litigation of a particular kind, recommending particular lawyers and financing such litigation. Surely it is beyond the power of any State to prevent the exercise of constitutional rights in the name of preventing a lay entity from controlling litigation. Consequently, I concur in the judgment of the Court, but not in all of its opinion.

If we had before us, which we do not, a narrowly drawn statute proscribing only the actual day-to-day management and dictation of the tactics, strategy and conduct of litigation by a lay entity such as the NAACP, the issue would be considerably different, at least for me; for in my opinion neither the practice of law by such an organization nor its management of the litigation of its members or others is constitutionally protected. Both practices are well within the regulatory power of the State. In this regard I agree with my Brother Harlan.

It is not at all clear to me, however, that the opinion of the majority would not also strike down such a narrowly

drawn statute. To the extent that it would, I am in dis-
agreement. Certainly the NAACP, as I understand its
position before this Court, denied that it had managed or
controlled the litigation which it had urged its members or
others to bring, disclaimed any desire to do so and denied
any adverse effects upon its operations if lawyers repre-
senting clients in school desegregation or other litigation
financed by the NAACP represented only those clients and
were under no obligation to follow the dictates of the
NAACP in the conduct of that litigation. I would avoid
deciding a case not before the Court.

MR. JUSTICE HARLAN, whom MR. JUSTICE CLARK and
MR. JUSTICE STEWART join, dissenting.

No member of this Court would disagree that the valid-
ity of state action claimed to infringe rights assured by
the Fourteenth Amendment is to be judged by the same
basic constitutional standards whether or not racial prob-
lems are involved. No worse setback could befall the
great principles established by *Brown* v. *Board of Educa-
tion,* 347 U. S. 483, than to give fair-minded persons rea-
son to think otherwise. With all respect, I believe that
the striking down of this Virginia statute cannot be
squared with accepted constitutional doctrine in the do-
main of state regulatory power over the legal profession.

I.

At the outset the factual premises on which the Virginia
Supreme Court of Appeals upheld the application of
Chapter 33 to the activities of the NAACP in the area of
litigation, as well as the scope of that court's holding,
should be delineated.

*First,* the lawyers who participate in litigation spon-
sored by petitioner are, almost without exception, mem-
bers of the legal staff of the NAACP Virginia State
Conference. (It is, in fact, against Conference policy to

give financial support to litigation not handled by a staff lawyer.) As such, they are selected by petitioner, are compensated by it for work in litigation (whether or not petitioner is a party thereto), and so long as they remain on the staff, are necessarily subject to its directions. As the Court recognizes, it is incumbent on staff members to agree to abide by NAACP policies.

*Second,* it is equally clear that the NAACP's directions, or those of its officers and divisions, to staff lawyers cover many subjects relating to the form and substance of litigation. Thus, in 1950, it was resolved at a Board of Directors meeting that:

> "Pleadings in all educational cases—the prayer in the pleading and proof be aimed at obtaining education on a non-segregated basis and that no relief other than that will be acceptable as such.
>
> "Further, that all lawyers operating under such rule will urge their client and the branches of the Association involved to insist on this final relief."

The minutes of the meeting went on to state:

> "Mr. Weber inquired if this meant that the branches would be prohibited from starting equal facility cases and the Special Counsel said it did."

In 1955, a Southwide NAACP. Conference issued directions to all NAACP branches outlining the procedure for obtaining desegregation of schools and indicating the point in the procedure at which litigation should be brought and the matter turned over to the "Legal Department." At approximately the same time, the Executive Secretary of the Virginia State Conference issued a directive urging that in view of the possibility of an extended court fight, "discretion and care should be exercised to secure petitioners who will—if need be—go all the way."

A report issued several years later, purporting to give an "up to date picture" of action taken in Virginia by

petitioner stated: "Selection of suit sites reserved for legal staff"; "State legal staff ready for action in selected areas"; and "The majority of our branches are willing to support legal action or any other program leading to early desegregation of schools that may be suggested by the National and State Conference officers."

In short, as these and other materials in the record show, the form of pleading, the type of relief to be requested, and the proper timing of suits have to a considerable extent, if not entirely, been determined by the Conference in coordination with the national office.

*Third,* contrary to the conclusion of the Federal District Court in the original federal proceeding, *NAACP* v. *Patty,* 159 F. Supp. 503, 508–509, the present record establishes that the petitioner does a great deal more than to advocate litigation and to wait for prospective litigants to come forward. In several instances, especially in litigation touching racial discrimination in public schools, specific directions were given as to the types of prospective plaintiffs to be sought, and staff lawyers brought blank forms to meetings for the purpose of obtaining signatures authorizing the prosecution of litigation in the name of the signer.

*Fourth,* there is substantial evidence indicating that the normal incidents of the attorney-client relationship were often absent in litigation handled by staff lawyers and financed by petitioner. Forms signed by prospective litigants have on occasion not contained the name of the attorney authorized to act. In many cases, whether or not the form contained specific authorization to that effect, additional counsel have been brought into the action by staff counsel. There were several litigants who testified that at no time did they have any personal dealings with the lawyers handling their cases nor were they aware until long after the event that suits had been filed in their names. This is not to suggest that the petitioner

has been shown to have sought plaintiffs under false pretenses or by inaccurate statements. But there is no basis for concluding that these were isolated incidents, or that petitioner's methods of operation have been such as to render these happenings out of the ordinary.

On these factual premises, amply supported by the evidence, the Virginia Supreme Court of Appeals held that petitioner and those associated with it

"solicit prospective litigants to authorize the filing of suits by NAACP and Fund [Educational Defense Fund] lawyers, who are paid by the Conference and controlled by NAACP policies . . ." (202 Va., at 159; 116 S. E. 2d, at 68–69),

and concluded that this conduct violated Chapter 33 as well as Canons 35 and 47 of the Canons of Professional Ethics of the American Bar Association, which had been adopted by the Virginia courts more than 20 years ago.

At the same time the Virginia court demonstrated a responsible awareness of two important limitations on the State's power to regulate such conduct. The first of these is the long-standing recognition, incorporated in the Canons, of the different treatment to be accorded to those aiding the indigent in prosecuting or defending against legal proceedings. The second, which coupled with the first led the court to strike down Chapter 36 (*ante,* p. 418), is the constitutional right of any person to express his views, to disseminate those views to others, and to advocate action designed to achieve lawful objectives, which in the present case are also constitutionally due. Mindful of these limitations, the state court construed Chapter 33 not to prohibit petitioner and those associated with it from acquainting colored persons with what it believes to be their rights, or from advising them to assert those rights in legal proceedings, but only from "solicit[ing] legal business for their attorneys or any

particular attorneys." Further, the court determined that Chapter 33 did not preclude petitioner from contributing money to persons to assist them in prosecuting suits, if the suits "have not been solicited by the appellants [the NAACP and Defense Fund] or those associated with them, and channeled by them to their attorneys or any other attorneys."

In my opinion the litigation program of the NAACP, as shown by this record, falls within an area of activity which a State may constitutionally regulate. (Whether it was wise for Virginia to exercise that power in this instance is not, of course, for us to say.) The Court's contrary conclusion rests upon three basic lines of reasoning: (1) that in the context of the racial problem the NAACP's litigating activities are a form of political expression within the protection of the First Amendment, as extended to the States by the Fourteenth; (2) that no sufficiently compelling subordinating state interest has been shown to justify Virginia's particular regulation of these activities; and (3) that in any event Chapter 33 must fall because of vagueness, in that as construed by the state court the line between the permissible and impermissible under the statute is so uncertain as potentially to work a stifling of constitutionally protected rights. Each of these propositions will be considered in turn.

## II.

Freedom of expression embraces more than the right of an individual to speak his mind. It includes also his right to advocate and his right to join with his fellows in an effort to make that advocacy effective. *Thomas* v. *Collins,* 323 U. S. 516; *NAACP* v. *Alabama,* 357 U. S. 449; *Bates* v. *Little Rock,* 361 U. S. 516. And just as it includes the right jointly to petition the legislature for redress of grievances, see *Eastern R. Presidents Conference* v. *Noerr Motor Freight, Inc.,* 365 U. S. 127, 137–

138, so it must include the right to join together for purposes of obtaining judicial redress. We have passed the point where litigation is regarded as an evil that must be avoided if some accommodation short of a lawsuit can possibly be worked out. Litigation is often the desirable and orderly way of resolving disputes of broad public significance, and of obtaining vindication of fundamental rights. This is particularly so in the sensitive area of racial relationships.

But to declare that litigation is a form of conduct that may be associated with political expression does not resolve this case. Neither the First Amendment nor the Fourteenth constitutes an absolute bar to government regulation in the fields of free expression and association. This Court has repeatedly held that certain forms of speech are outside the scope of the protection of those Amendments, and that, in addition, "general regulatory statutes, not intended to control the content of speech but incidentally limiting its unfettered exercise," are permissible "when they have been found justified by subordinating valid governmental interests." [1] The problem in each such case is to weigh the legitimate interest of the State against the effect of the regulation on individual rights.

An analogy may be drawn between the present case and the rights of workingmen in labor disputes. At the heart of these rights are those of a laborer or a labor representative to speak: to inform the public of his disputes and to urge his fellow workers to join together for mutual aid and protection. So important are these particular rights that absent a clear and present danger of the gravest evil,

---

[1] *Konigsberg* v. *State Bar,* 366 U. S. 36, 50–51; and see cases cited therein, including *Cox* v. *New Hampshire,* 312 U. S. 569; *Chaplinsky* v. *New Hampshire,* 315 U. S. 568; *Breard* v. *Alexandria,* 341 U. S. 622; *Roth* v. *United States,* 354 U. S. 476; *Bates* v. *Little Rock,* 361 U. S. 516, 524; *Wilkinson* v. *United States,* 365 U. S. 399.

the State not only is without power to impose a blanket prohibition on their exercise, *Thornhill* v. *Alabama,* 310 U. S. 88, but also may not place any significant obstacle in their path, *Thomas* v. *Collins,* 323 U. S. 516.

But as we move away from speech alone and into the sphere of conduct—even conduct associated with speech or resulting from it—the area of legitimate governmental interest expands. A regulation not directly suppressing speech or peaceable assembly, but having some impact on the form or manner of their exercise will be sustained if the regulation has a reasonable relationship to a proper governmental objective and does not unduly interfere with such individual rights. Thus, although the State may not prohibit all informational picketing, it may prevent mass picketing, *Allen-Bradley Local* v. *Wisconsin Board,* 315 U. S. 740, and picketing for an unlawful objective, *Giboney* v. *Empire Storage & Ice Co.,* 336 U. S. 490. Although it may not prevent advocacy of union membership, it can to some degree inquire into and define the qualifications of those who solicit funds from prospective members or who hold other positions of responsibility.[2] A legislature may not wholly eliminate the right of collective action by workingmen,[3] but it may to a significant extent dictate the form their organization shall take [4] and may limit the demands that the organization may make on employers and others, see, *e. g., International Brotherhood of Electrical Workers* v. *Labor Board,* 341 U. S. 694, 705.

Turning to the present case, I think it evident that the basic rights in issue are those of the petitioner's members

---

[2] See *Thomas* v. *Collins,* 323 U. S. 516, 544–545 (concurring opinion); *American Communications Assn.* v. *Douds,* 339 U. S. 382; *De Veau* v. *Braisted,* 363 U. S. 144.

[3] See the discussion in *Hague* v. *C. I. O.,* 307 U. S. 496, 518, 523–525 (opinion of Mr. Justice Stone).

[4] See, *e. g.,* the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519, 29 U. S. C. (Supp. III) §§ 401 *et seq.*

to associate, to discuss, and to advocate. Absent the gravest danger to the community, these rights must remain free from frontal attack or suppression, and the state court has recognized this in striking down Chapter 36 and in carefully limiting the impact of Chapter 33. But litigation, whether or not associated with the attempt to vindicate constitutional rights, is *conduct;* it is speech *plus.* Although the State surely may not broadly prohibit individuals with a common interest from joining together to petition a court for redress of their grievances, it is equally certain that the State may impose reasonable regulations limiting the permissible form of litigation and the manner of legal representation within its borders. Thus the State may, without violating protected rights, restrict those undertaking to represent others in legal proceedings to properly qualified practitioners. And it may determine that a corporation or association does not itself have standing to litigate the interests of its shareholders or members—that only individuals with a direct interest of their own may join to press their claims in its courts. Both kinds of regulation are undeniably matters of legitimate concern to the State and their possible impact on the rights of expression and association is far too remote to cause any doubt as to their validity.

So here, the question is whether the particular regulation of conduct concerning litigation has a reasonable relation to the furtherance of a proper state interest, and whether that interest outweighs any foreseeable harm to the furtherance of protected freedoms.

## III.

The interest which Virginia has here asserted is that of maintaining high professional standards among those who practice law within its borders. This Court has consistently recognized the broad range of judgments that a State may properly make in regulating any profession.

See, *e. g., Dent* v. *West Virginia,* 129 U. S. 114; *Semler* v. *Oregon State Board of Dental Examiners,* 294 U. S. 608; *Williamson* v. *Lee Optical Co.,* 348 U. S. 483. But the regulation of professional standards for members of the bar comes to us with even deeper roots in history and policy, since courts for centuries have possessed disciplinary powers incident to the administration of justice. See *Cohen* v. *Hurley,* 366 U. S. 117, 123–124; *Konigsberg* v. *State Bar,* 366 U. S. 36; *Martin* v. *Walton,* 368 U. S. 25.

The regulation before us has its origins in the long-standing common-law prohibitions of champerty, barratry, and maintenance, the closely related prohibitions in the Canons of Ethics against solicitation and intervention by a lay intermediary, and statutory provisions forbidding the unauthorized practice of law.[5] The Court

---

[5] See 4 Blackstone, Commentaries, 134–136. Even apart from any state statutory provisions, state judiciaries normally consider themselves free, in the exercise of their supervisory authority over the bar, to enforce these prohibitions derived from the common law. See, *e. g., In re Co-operative Law Co.,* 198 N. Y. 479, 92 N. E. 15; *People ex rel. Courtney* v. *Association of Real Estate Tax-payers,* 354 Ill. 102, 187 N. E. 823; *In re Maclub of America, Inc.,* 295 Mass. 45, 3 N. E. 2d 272, and cases cited therein. Many States, however, also have statutes dealing with these matters. Some merely incorporate the common-law proscriptions of barratry and maintenance. *E. g.,* Del. Code Ann., 1953, Tit. 11, § 371; Mo. Stat. Ann., § 557.470 (Vernon, 1953). Several specifically prohibit the solicitation of legal business for a lawyer by an agent or "runner." *E. g.,* Conn. Gen. Stat., 1958, § 51–87; N. C. Gen. Stat., § 84–38 (1958 Repl. Vol.); Wis. Stat. Ann., § 256.295 (1). About 25 States prohibit the unauthorized practice of law by corporations. American Bar Foundation, Unauthorized Practice Statute Book (1961), 78–90.

Virginia's concern with these problems dates back to the beginning of the Commonwealth. Act of December 8, 1792, 1 Va. Stat. 110 (Shepherd, 1835). Sections 54–74 and 54–78, which as amended are before us today, were originally enacted in 1932, Va. Acts 1932, cc. 129, 284, and the Virginia Supreme Court of Appeals adopted the American Bar Association Canons of Ethics *in haec verba* in 1938. Virginia Canons of Professional Ethics, 171 Va. xviii–xxxv. As in

recognizes this formidable history, but puts it aside in the present case on the grounds that there is here no element of malice or of pecuniary gain, that the interests of the NAACP are not to be regarded as substantially different from those of its members, and that we are said to be dealing here with a matter that transcends mere legal ethics—the securing of federally guaranteed rights. But these distinctions are too facile. They do not account for the full scope of the State's legitimate interest in regulating professional conduct. For although these professional standards may have been born in a desire to curb malice and self-aggrandizement by those who would use clients and the courts for their own pecuniary ends, they have acquired a far broader significance during their long development.

*First,* with regard to the claimed absence of the pecuniary element, it cannot well be suggested that the attorneys here are donating their services, since they are in fact compensated for their work. Nor can it tenably be argued that petitioner's litigating activities fall into the accepted category of aid to indigent litigants.[6] The reference is presumably to the fact that petitioner itself is a nonprofit organization not motivated by desire for financial gain but by public interest and to the fact that no monetary stakes are involved in the litigation.

But a State's felt need for regulation of professional conduct may reasonably extend beyond mere "ambulance chasing." In *People ex rel. Courtney* v. *Association of*

---

many other States, the judiciary of Virginia has declared its inherent authority to assure proper ethical deportment. See, *e. g., Richmond Assn. of Credit Men, Inc.,* v. *Bar Assn.,* 167 Va. 327, 335–336, 189 S. E. 153, 157.

[6] Virginia's policy of promoting aid to indigent suitors is of long standing, see 2 The Papers of Thomas Jefferson (Boyd ed. 1950), 628, and the decision of the state court in this case fully implements that policy.

*Real Estate Tax-payers,* 354 Ill. 102, 187 N. E. 823, a non-profit corporation was held in contempt for engaging in the unauthorized practice of law. The Association was formed by citizens desiring to mount an attack on the constitutionality of certain tax rolls. Membership was solicited by the circulation of blank forms authorizing employment of counsel on the applicant's behalf and asking that property be listed for litigation. The attorneys were selected, paid, and controlled by the corporation, which made their services available to the taxpayer members at no cost.[7]

Similarly, several decisions have condemned the provision of counsel for their members by nonprofit automobile clubs, even in instances involving challenges to the validity of a statute or ordinance. *In re Maclub of America, Inc.,* 295 Mass. 45, 3 N. E. 2d 272;[8] *People ex rel. Chicago Bar Assn.* v. *Chicago Motor Club,* 362 Ill. 50, 199 N. E. 1; see Opinion 8, Opinions of the Committee on Professional Ethics and Grievances, American Bar Assn.

Of particular relevance here is a series of nationwide adjudications culminating in 1958 in *In re Brotherhood of*

---

[7] The Court, p. 442, n. 25, *ante,* deals with the *Real Estate Tax-payers* case simply by referring to it as one in which the "parties and Association attorneys had large sums of money at stake." It is true that the attorneys there (as here) were paid for their services by the Association although we are not told the amount of the payment to any attorney. It is also true that the constitutional rights which the members were there seeking to assert through the nonprofit Association were property rights, having monetary value. But I fail to see how these factors can be deemed to create an "element of pecuniary gain" which distinguishes the *Real Estate Tax-payers* case from the present one in any significant respect.

[8] The activities of the Association in this *Maclub* case were more limited than those of the Association in the *Real Estate Tax-payers* case. The attorneys in *Maclub* were selected and retained directly by the members and bills were then submitted to and paid by the Association.

*Railroad Trainmen,* 13 Ill. 2d 391, 150 N. E. 2d 163. That was a proceeding, remarkably similar to the present one, for a declaratory judgment that the activities of the Brotherhood in assisting with the prosecution of its members' personal injury claims under the Federal Employers' Liability Act [9] were not inconsistent with a state law forbidding lay solicitation of legal business. The court found that each lodge of the Brotherhood appointed a member to file accident reports with the central office, and these reports were sent by the central office to a regional investigator, who, equipped with a contract form for the purpose, would urge the injured member to consult and employ one of the 16 regional attorneys retained by the Brotherhood. The regional counsel offered his services to the injured person on the basis of a contingent fee, the amount of which was fixed by the Brotherhood. The counsel themselves bore the costs of investigation and suit and of operating the Union's legal aid department.

The Union argued that it was not motivated by any desire for profit; that it had an interest commensurate with that of its members in enforcement of the federal statute; and that the advantage taken of injured parties by unscrupulous claims adjustors made it essential to furnish economical recourse to dependable legal assistance. The court ruled against the Union on each of these points. It permitted the organization to maintain an investigative staff, to advise its members regarding their legal rights and to recommend particular attorneys, but it required the Union to stop fixing fees, to sever all financial connections with counsel, and to cease the distribution of contract forms.

The practices of the Brotherhood, similar in so many respects to those engaged in by the petitioner here, have

---

[9] 35 Stat. 65 (1908), as amended, 45 U. S. C. §§ 51–60.

been condemned by every state court which has considered them. *Petition of Committee on Rule 28 of the Cleveland Bar Assn.,* 15 Ohio L. Abs. 106; *In re O'Neill,* 5 F. Supp. 465 (D. C. E. D. N. Y.); *Hildebrand* v. *State Bar,* 36 Cal. 2d 504, 225 P. 2d 508; *Doughty* v. *Grills,* 37 Tenn. App. 63, 260 S. W. 2d 379; and see *Atchison, T. & S. F. R. Co.* v. *Jackson,* 235 F. 2d 390, 393 (C. A. 10th Cir.). And for similar opinions on related questions by bar association committees, see Opinion A, Opinions of the Committee on Unauthorized Practice of the Law, American Bar Assn., 36 A. B. A. J. 677; Opinion 773, Committee on Professional Ethics, Assn. of the Bar of the City of New York.

Underlying this impressive array of relevant precedent is the widely shared conviction that avoidance of improper pecuniary gain is not the only relevant factor in determining standards of professional conduct. Running perhaps even deeper is the desire of the profession, of courts, and of legislatures to prevent any interference with the uniquely personal relationship between lawyer and client and to maintain untrammeled by outside influences the responsibility which the lawyer owes to the courts he serves.

When an attorney is employed by an association or corporation to represent individual litigants, two problems arise, whether or not the association is organized for profit and no matter how unimpeachable its motives. The lawyer becomes subject to the control of a body that is not itself a litigant and that, unlike the lawyers it employs, is not subject to strict professional discipline as an officer of the court. In addition, the lawyer necessarily finds himself with a divided allegiance—to his employer and to his client—which may prevent full compliance with his basic professional obligations. The matter was well stated, in a different but related context, by the New

York Court of Appeals in *In re Co-operative Law Co.,* 198 N. Y. 479, 483–484, 92 N. E. 15, 16:

> "The relation of attorney and client is that of master and servant in a limited and dignified sense, and it involves the highest trust and confidence. It cannot be delegated without consent and it cannot exist between an attorney employed by a corporation to practice law for it, and a client of the corporation, for he would be subject to the directions of the corporation and not to the directions of the client."

There has, to be sure, been professional criticism of certain applications of these policies.[10] But the continued vitality of the principles involved is beyond dispute,[11] and at this writing it is hazardous at best to predict the direction of the future. For us, however, any such debate is without relevance, since it raises questions of social policy which have not been delegated to this Court for decision. Our responsibility is simply to determine the extent of the State's legitimate interest and to decide whether the course adopted bears a sufficient relation to that interest to fall within the bounds set by the Constitution.

*Second,* it is claimed that the interests of petitioner and its members are sufficiently identical to eliminate any "serious danger" of "professionally reprehensible conflicts of interest." *Ante,* p. 443. Support for this claim is sought in our procedural holding in *NAACP* v. *Alabama,* 357 U. S.

---

[10] See, *e. g.,* Weihofen, "Practice of Law" by Non-Pecuniary Corporations: A Social Utility, 2 U. of Chi. L. Rev. 119; Drinker, Legal Ethics, 161–167; Traynor, J., dissenting in *Hildebrand* v. *State Bar, supra.*

[11] In addition to the decisions discussed in the text, further evidence of the attitude of the bench and bar is found in a survey described in McCracken, Report on Observance by the Bar of Stated Professional Standards, 37 Va. L. Rev. 399, 400–401 (1951).

449, 458–459.   But from recognizing, as in that case, that the NAACP has standing to assert the rights of its members when it is a real party in interest, it is plainly too large a jump to conclude that whenever individuals are engaged in litigation involving claims that the organization promotes, there cannot be any significant difference between the interests of the individual and those of the group.

The NAACP may be no more than the sum of the efforts and views infused in it by its members; but the totality of the separate interests of the members and others whose causes the petitioner champions, even in the field of race relations, may far exceed in scope and variety that body's views of policy, as embodied in litigating strategy and tactics.   Thus it may be in the interest of the Association in every case to make a frontal attack on segregation, to press for an immediate breaking down of racial barriers, and to sacrifice minor points that may win a given case for the major points that may win other cases too.   But in a particular litigation, it is not impossible that after authorizing action in his behalf, a Negro parent, concerned that a continued frontal attack could result in schools closed for years, might prefer to wait with his fellows a longer time for good-faith efforts by the local school board than is permitted by the centrally determined policy of the NAACP.   Or he might see a greater prospect of success through discussions with local school authorities than through the litigation deemed necessary by the Association.   The parent, of course, is free to withdraw his authorization, but is his lawyer, retained and paid by petitioner and subject to its directions on matters of policy, able to advise the parent with that undivided allegiance that is the hallmark of the attorney-client relation? I am afraid not.

Indeed, the potential conflict in the present situation is perhaps greater than those in the union, automobile club, and some of the other cases discussed above, pp. 457–460.

For here, the interests of the NAACP go well beyond the providing of competent counsel for the prosecution or defense of individual claims; they embrace broadly fixed substantive policies that may well often deviate from the immediate, or even long-range, desires of those who choose to accept its offers of legal representations. This serves to underscore the close interdependence between the State's condemnation of solicitation and its prohibition of the unauthorized practice of law by a lay organization.

*Third,* it is said that the practices involved here must stand on a different footing because the litigation that petitioner supports concerns the vindication of constitutionally guaranteed rights.[12]

But surely state law is still the source of basic regulation of the legal profession, whether an attorney is pressing a federal or a state claim within its borders. See *In re Brotherhood of Railroad Trainmen, supra.* The true question is whether the State has taken action which unreasonably obstructs the assertion of federal rights. Here, it cannot be said that the underlying state policy is inevitably inconsistent with federal interests. The State has sought to prohibit the solicitation and sponsoring of litigation by those who have no standing to initiate that litigation themselves and who are not simply coming to the

---

[12] It is interesting to note the Court's reliance on Opinion 148, Opinions of the Committee on Professional Ethics and Grievances, American Bar Assn. This opinion, issued in 1935 at the height of the resentment in certain quarters against the New Deal, approved the practice of the National Lawyers Committee of the Liberty League in publicly offering free legal services (without compensation from any source) to anyone who was *unable to afford* to challenge the constitutionality of legislation which he believed was violating his rights. The opinion may well be debatable as a matter of interpretation of the Canons. But in any event I think it wholly untenable to suggest (as the Court does in its holding today) that a contrary opinion regarding *paid* legal services to *nonindigent* litigants would be unconstitutional.

assistance of indigent litigants. Thus the state policy is not unrelated to the federal rules of standing—the insistence that federal court litigants be confined to those who can demonstrate a pressing personal need for relief. See *McCabe* v. *Atchison, T. & S. F. R. Co.,* 235 U. S. 151, 162; *Massachusetts* v. *Mellon,* 262 U. S. 447, 488; cf. *Stark* v. *Wickard,* 321 U. S. 288, 304–305, and cases cited therein. This is a requirement of substance as well as form. It recognizes that, although litigation is not something to be avoided at all costs, it should not be resorted to in undue haste, without any effort at extrajudicial resolution, and that those lacking immediate private need may make unnecessary broad attacks based on inadequate records. Nor is the federal interest in impeding precipitate resort to litigation diminished when that litigation concerns constitutional issues; if anything, it is intensified. *United Public Workers* v. *Mitchell,* 330 U. S. 75, 86–91.

There remains to be considered on this branch of the argument the question whether this particular exercise of state regulatory power bears a sufficient relation to the established and substantial interest of the State to overcome whatever indirect impact this statute may have on rights of free expression and association.

Chapter 33 as construed does no more than prohibit petitioner and those associated with it from soliciting legal business for its staff attorneys or, under a fair reading of the state court's opinion and amounting to the same thing, for "outside" attorneys who are subject to the Association's control in the handling of litigation which it refers to them. See pp. 466–468, *infra.* Such prohibitions bear a strong and direct relation to the area of legitimate state concern. In matters of policy, involving the form, timing, and substance of litigation, such attorneys are subject to the directions of petitioner and not of those nominally their clients. Further, the methods used to obtain litigants are not conducive to encouraging the kind of attor-

ney-client relationships which the State reasonably may demand. There inheres in these arrangements, then, the potentialities of divided allegiance and diluted responsibility which the State may properly undertake to prevent.

The impact of such a prohibition on the rights of petitioner and its members to free expression and asssociation cannot well be deemed so great as to require that it be struck down in the face of this substantial state interest. The important function of organizations like petitioner in vindicating constitutional rights is not of course to be minimized, but that function is not, in my opinion, substantially impaired by this statute. Of cardinal importance, this regulatory enactment as construed does not in any way suppress assembly, or advocacy of litigation in general or in particular. Moreover, contrary to the majority's suggestion, it does not, in my view, prevent petitioner from recommending the services of attorneys who are not subject to its directions and control. See pp. 460–468, *infra*. And since petitioner may contribute to those who need assistance, the prohibition should not significantly discourage anyone with sufficient interest from pressing his claims in litigation or from joining with others similarly situated to press those claims. It prevents only the solicitation of business for attorneys subject to petitioner's control, and as so limited, should be sustained.

## IV.

The Court's remaining line of reasoning is that Chapter 33 as construed (hereafter sometimes simply "the statute") must be struck down on the score of vagueness and ambiguity. I think that this "vagueness" concept has no proper place in this case and only serves to obscure rather than illuminate the true questions presented.

The Court's finding of ambiguity rests on the premise that the statute may prohibit *mere* recommendation of "any particular attorney," whether or not a member of

the NAACP's legal staff or otherwise subject to the Association's direction and control. Proceeding from this premise the Court ends by invalidating the entire statute on the basis that this alleged vagueness too readily lends itself to the stifling of protected activity.

The cardinal difficulty with this argument is that there simply is no real uncertainty in the statute, as the state court found, 202 Va., at 154, 116 S. E. 2d, at 65, or in that court's construction of it. It is true that the concept of vagueness has been used to give "breathing space" to "First Amendment freedoms," see Amsterdam, Note, The Void-For-Vagueness Doctrine in the Supreme Court, 109 U. of Pa. L. Rev. 67, but it is also true, as that same commentator has well stated, that "[v]agueness is not an extraneous ploy or a judicial *deus ex machina.*" *Id.,* at 88. There is, in other words, "an actual vagueness component in the vagueness decisions." *Ibid.* And the test is whether the law in question has established standards of guilt sufficiently ascertainable that men of common intelligence need not guess at its meaning. *Connally* v. *General Constr. Co.,* 269 U. S. 385; *Winters* v. *New York,* 333 U. S. 507. Laws that have failed to meet this standard are, almost without exception, those which turn on language calling for the exercise of subjective judgment, unaided by objective norms. *E. g., United States* v. *L. Cohen Grocery Co.,* 255 U. S. 81 ("unreasonable" charges); *Winters* v. *New York, supra* ("so massed as to become vehicles for inciting"); *Joseph Burstyn, Inc.,* v. *Wilson,* 343 U. S. 495 ("sacrilegious"). No such language is to be found here.

Ambiguity in the present statute can be made to appear only at the price of strained reading of the state court's opinion. As construed, the statute contains two types of prohibition relating to solicitation. The first prohibits such groups as the NAACP and the Educational Defense Fund, "their officers, members, affiliates, voluntary work-

ers and attorneys" from soliciting legal business for "their attorneys."[13] And the state court made it clear that "their attorneys" referred to "attorneys whom they [the NAACP and the Fund] pay, and who are subject to their directions." 202 Va., at 164, 116 S. E. 2d, at 72. This is the practice with which the state court's opinion is predominantly concerned and which gave rise to the intensive consideration by that court of the relations between petitioner and its legal staff. Surely, there is no element of uncertainty involved in this prohibition. The state court has made it plain that the solicitation involved is not the advocacy of litigation in general or in particular but only that involved in the handling of litigation by petitioner's own paid and controlled staff attorneys. Compare *Thomas* v. *Collins*, 323 U. S. 516.

The second prohibition in the statute is the solicitation by petitioner of legal business for "any particular attorneys" or the channeling of litigation which it supports to "any other attorneys," whether or not they are petitioner's staff attorneys. This language of the state court, coupled primarily with this Court's own notion that Chapter 33 in defining "agents" has departed from common-law principles, leads the majority to conclude that the statute may have been interpreted as precluding organizations such as petitioner from simply advising prospective litigants to engage for themselves particular attorneys, whether members of the organization's legal staff or not.

Surely such an idea cannot be entertained with respect to the state court's discussion of the NAACP and its staff attorneys. The record is barren of all evidence that any litigant, in the type of litigation with which this case is concerned, ever attempted to retain for his own account

---

[13] As a corollary, attorneys are prohibited, by the law as construed, from accepting employment by petitioner in suits solicited by petitioner.

one of those attorneys, and indeed strongly indicates that such an arrangement would not have been acceptable to the NAACP so long as such a lawyer remained on its legal staff. And the state court's opinion makes it clear that that court was not directing itself to any such situation.

Nor do I think it may reasonably be concluded that the state court meant to preclude the NAACP from recommending "outside" attorneys to prospective litigants, so long as it retained no power of direction over such lawyers. Both in their immediate context and in light of the entire opinion and record below, it seems to me very clear that the phrases "or any particular attorneys" and "or any other attorneys" both have reference only to those "outside" attorneys with respect to whom the NAACP or the Defense Fund bore a relationship equivalent to that existing between them and "their attorneys." [14] It savors almost of disrespect to the Virginia Supreme Court of Appeals, whose opinion manifests full awareness of the considerations that have traditionally marked the line between professional and unprofessional conduct, to read this part of its opinion otherwise. Indeed the ambiguity which this Court now finds quite evidently escaped the notice of both petitioner and its counsel for they did not so much as suggest such an argument in their briefs. Moreover, the kind of approach that the majority takes to the statute is quite inconsistent with the precept that our duty is to construe legislation, if possible, "to save and not to destroy." *Labor Board* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, 30, and cases cited; *United States* v. *Rumely,* 345 U. S. 41, 47.

But even if the statute justly lent itself to the now attributed ambiguity, the Court should excise only the ambiguous part of it, not strike down the enactment in

---

[14] The full text of those portions of the state court opinion in which these phrases appear is quoted in footnote 9 of the majority opinion, *ante,* p. 426.

its entirety. Our duty to respect state legislation, and to go no further than we must in declining to sustain its validity, has led to a doctrine of separability in constitutional adjudication, always followed except in instances when its effect would be to leave standing a statute that was still uncertain in its potential application.[15] See *Smith* v. *California,* 361 U. S. 147, 151. Given the "ambiguity" view of the Court, the separability doctrine should at least have been applied here, since what would then remain of Chapter 33 could not conceivably be deemed ambiguous.[16] In my view, however, the statute as construed below is not ambiguous at all.

## V.

Since the majority has found it unnecessary to consider them, only a few words need be said with respect to petitioner's contentions that Chapter 33 deprives it of property without due process of law and denies it equal protection.

The due process claim is disposed of once it appears that this statute falls within the range of permissible state regulation in pursuance of a legitimate goal. Pp. 455–465, *supra.*

As to equal protection, this position is premised on the claim that the law was directed solely at petitioner's activities on behalf of Negro litigants. But Chapter 33 as it comes to us, with a narrowing construction by the state court that anchors the statute firmly to the common law and to the court's own independently existing supervisory

---

[15] Of course, if we refuse to sustain one part of a state statute, the state court on remand may decide that the remainder of the statute can no longer stand, but insofar as that conclusion is reached as a matter of state law, it is of no concern to us.

[16] Cf. *Stromberg* v. *California,* 283 U. S. 359, in which the state law condemned the displaying of a red flag for any of three purposes and this Court sustained the validity of the law as to two of these purposes but struck it down for vagueness as to the third.

powers over the Virginia legal profession, leaves no room for any finding of discriminatory purpose. Petitioner is merely one of a variety of organizations that may come within the scope of the long-standing prohibitions against solicitation and unauthorized practice. It would of course be open to the petitioner, if the facts should warrant, to claim that Chapter 33 was being enforced discriminatorily as to it and not against others similarly circumstanced. See *Yick Wo* v. *Hopkins,* 118 U. S. 356, 373–374. But the present record is barren of any evidence suggesting such unequal application, and we may not presume that it will occur. *Lieberman* v. *Van de Carr,* 199 U. S. 552, 562–563; *Douglas* v. *Noble,* 261 U. S. 165, 170.[17]

I would affirm.

---

[17] It has been suggested that the state law may contain an invidious discrimination because it treats those organizations that have a pecuniary interest in litigation (for example, an insurance company) differently from those that do not. But surely it cannot be said that this distinction, which is so closely related to traditional concepts of privity, lacks any rational basis. The importance of the existence of a pecuniary interest in determining the propriety of sponsoring litigation has long been recognized at common law, both in England, see *Findon* v. *Parker,* 11 M. & W. 675, 152 Eng. Rep. 976 (Exch. 1843), and in the United States, see, *e. g., Dorwin* v. *Smith,* 35 Vt. 69; *Vaughan* v. *Marable,* 64 Ala. 60, 66–67; *Smith* v. *Hartsell,* 150 N. C. 71, 63 S. E. 172. The distinction drawn by the Virginia law is not without parallel in the requirement that in the absence of a statute or rule a suit in a federal court attacking the validity of a law may be brought only by one who is in immediate danger of sustaining some direct and substantial injury as the result of its enforcement, and not by one who merely "suffers in some indefinite way in common with people generally," or even in common with members of the same race or class. *Massachusetts* v. *Mellon,* 262 U. S. 447, 487–488. See *McCabe* v. *Atchison, T. & S. F. R. Co.,* 235 U. S. 151, 162. And of course the motives of the Virginia legislators in enacting Chapter 33 are beyond the purview of this Court's responsibilities. *Fletcher* v. *Peck,* 6 Cranch 87, 130; see *Arizona* v. *California,* 283 U. S. 423, 455; cf. *Tenney* v. *Brandhove,* 341 U. S. 367, 377.